SOUTH DAKOTA *v.* NORTH CAROLINA.

IN THE SUPREME COURT OF THE UNITED STATES.

No. 8. Original. Argued April 13, 14, 15, 1903; reargued January 8, 11, 12, 1904.—Decided February 1, 1904.

This court has jurisdiction over an action brought by one State against another to enforce a property right, and where one State owns absolutely bonds of another State, which are specifically secured by shares of stock belonging to the debtor State this court can enter a decree adjudging the amount due and for foreclosure and sale of the security in case of non-payment, leaving the question of judgment over for any deficiency to be determined when it arises.

The motive of a gift does not affect its validity, nor is the jurisdiction of this court affected by the fact that the bonds were originally owned by an individual who donated them to the complainant State.

Where a statute provides that a State issue bonds at not less than par to pay for a subscription to stock of a railroad company; and, after advertising for bids in accordance with the statute and receiving none, the bonds are delivered to the railroad company in payment of the subscription, the

. transaction is equivalent to a cash sale to the company at par, and the State becomes the owner of the stock even though no formal certificates therefor are issued to it.

Under the special provisions of the statute involved the endorsement on bonds that each bond for $1000 is secured by an equal amount of the par value of the stock subscribed for by the State, is tantamount to a separation and identification of the number of shares mentioned and constitutes a separate and registered mortgage on that number of shares for each bond.

A holder of a certain number of such bonds may foreclose on the specific number of shares securing his bonds and the holders of other bonds and of liens on the property of the railroad company are not necessary parties to the foreclosure suit.

BY an act passed in 1849, chap. 82, Laws, 1848–49, the North Carolina Railroad Company was chartered by the State of North Carolina with a capital of $3,000,000, divided into 30,000 shares of $100 each. The State subscribed for 20,000 shares. The statute authorized the borrowing of money to pay the state subscription and pledged as security therefor the stock of the railroad company held by the State. In 1855 a further subscription for 10,000 shares was authorized by statute, chap. 32, Laws, 1854–55, to be issued on the same terms and with the same security. At the same session an act was passed incorporating the Western North Carolina Railroad Company, chap. 228, Laws, 1854–55, which authorized a subscription by the State and the issue of bonds secured by the stock held by the State in said company. On December 19, 1866, a further act was passed, chap. 106, Laws, 1866–67, entitled "An act to enhance the value of the bonds to be issued for the completion of the Western North Carolina Railroad, and for other purposes," which, after referring to the prior acts of the State authorizing the issue of bonds and stating that a portion of them had already been issued, added:

"And, whereas, it is manifestly the interest of the people of the whole State, that the residue of the bonds, when issued, shall command a high price in market; therefore,

"SEC. 1. *Be it enacted by the General Assembly of the State of North Carolina, and it is hereby enacted by the authority of the*

*same,* That the public treasurer be, and he is hereby, authorized and directed, whenever it shall become his duty under the provisions of said acts, passed at the sessions of 1854–55 and 1860–61, to issue bonds of the State to the amount of fifty thousand dollars or more, to mortgage an equal amount of the stock which the State now holds in the North Carolina Railroad, as collateral security for the payment of said bonds, and to execute and deliver, with each several bond, a deed of mortgage for an equal amount of stock to said North Carolina Railroad, said mortgage to be signed by the Treasurer and countersigned by the Comptroller, to constitute a part of said bond, and to be transferable in like manner with it, as provided in the charter of said Western North Carolina Railroad Company; and, further, that such mortgages shall have all the force and effect, in law and equity, of registered mortgages without actual registry."

Under this last act bonds were issued in the sum of $1000 each, having this indorsement:

"State of North Carolina, Treasury Department,
"RALEIGH, July 1, 1867.

"Under the provisions of an act of the general assembly of North Carolina entitled 'An act to enhance the value of the bonds to be issued for the completion of the Western North Carolina Railroad Company, and for other purposes,' ratified 19th December, 1866, ten shares of the stock in the North Carolina Railroad Company, originally subscribed for by the State, are hereby mortgaged as collateral security for the payment of this bond.

"Witness the signature of the public treasurer and seal of office, and the counter-signature of the comptroller.

"KEMP P. BATTLE,
"S. W. BURGIN, *Comptroller.* *Public Treasurer.*"

These bonds ran thirty years and became due in 1897. In 1879 the State of North Carolina appointed commissioners to adjust and compromise the state debt, and all of the last men-

tioned bonds have been compromised with the exception of about $250,000. Simon Schafer and Samuel M. Schafer, either individually or as partners, owned a large proportion of these outstanding bonds, having held them for about thirty years. In 1901 Simon Shafer gave ten of these bonds to the State of South Dakota. The letter accompanying the gift was in these words:

"Office of Schafer Brothers, No. 35 Wall Street,

"NEW YORK, September 10th, 1901.

"Hon. Charles H. Burke.

"Dear Sir: The undersigned, one of the members of the firm of Schafer Bros., has decided, after consultation with the other holders of the second-mortgage bonds issued by the State of North Carolina, to donate ten of these bonds to the State of South Dakota.

"The holders of these bonds have waited for some thirty years in the hope that the State of North Carolina would realize the justice of their claims for the payment of these bonds.

"The bonds are all now about due, besides, of course, the coupons, which amount to some one hundred and seventy per cent of the face of the bond.

"The holders of these bonds have been advised that they cannot maintain a suit against the State of North Carolina on these bonds, but that such a suit can be maintained by a foreign State or by one of the United States.

"The owners of these bonds are mostly, if not entirely, persons who liberally give charity to the needy, the deserving and the unfortunate.

"These bonds can be used to great advantage by States or foreign governments; and the majority owners would prefer to use them in this way rather than take the trifle which is offered by the debtor.

"If your State should succeed in collecting these bonds it would be the inclination of the owners of a majority of the total issue now outstanding to make additional donations to such

governments as may be able to collect from the repudiating State, rather than accept the small pittance offered in settlement.

"The donors of these ten bonds would be pleased if the legislature of South Dakota should apply the proceeds of these bonds to the State University or to some of its asylums or other charities.

"Very respectfully,

"SIMON SCHAFER."

Prior thereto, and on March 11, 1901, the State of South Dakota had passed the following act, Session Laws, South Dakota, chap. 134, p. 227:

"An act to require the acceptance and collections of grants, devises, bequests, donations, and assignments to the State of South Dakota.

"*Be it enacted by the Legislature of the State of South Dakota:*

"SEC. 1. That whenever any grant, devise, bequest, donation or gift or assignment of money, bonds or choses in action, or of any property, real or personal, shall be made to this State, the governor is hereby directed to receive and accept the same, so that the right and title to the same shall pass to this State; and all such bonds, notes or choses in action, or the proceeds thereof when collected, and all other property or thing of value, so received by the State as aforesaid shall be reported by the governor to the legislature, to the end that the same may be covered into the public treasury or appropriated to the State University or to the public schools, or to state charities, as may hereafter be directed by law.

"SEC. 2. Whenever it shall be necessary to protect or assert the right or title of the State to any property so received or derived as aforesaid, or to collect or reduce into possession any bond, note, bill or chose in action, the attorney general is directed to take the necessary and proper proceedings and to bring suit in the name of the State in any court of competent jurisdiction, state or Federal, and to prosecute all such suits, and is author-

ized to employ counsel to be associated with him in such suits or actions, who, with him, shall fully represent the State, and shall be entitled to reasonable compensation out of the recoveries and collections in such suits and actions."

This act was passed on the suggestion that perhaps a donation of bonds of Southern States would be made to the State. On November 18, 1901, the State of South Dakota, leave having been first obtained, filed in this court its bill of complaint, making defendants the State of North Carolina, Simon Rothschilds (alleged to be one of the holders and owners of the bonds originally issued by the State and secured by a pledge of the stock in the North Carolina Railroad Company under the acts of 1849 and 1855) and Charles Salter (alleged to be one of the holders of the bonds issued under the act of 1855 and 1866 on account of the subscription to the Western North Carolina Railroad Company), the two individuals being made defendants as representatives of the classes of bondholders to which they severally belong. In it the plaintiff, after setting forth the facts in reference to the several issues of bonds and its acquisition of title to ten, prayed that an account might be taken of all the bonds issued by virtue of these statutes; that North Carolina be required to pay the amount found due on the bonds held by the plaintiff, and that in default of payment North Carolina and all persons claiming under said State might be barred and foreclosed of all equity and right of redemption in and to the thirty thousand shares of stock held by the State, and that these shares or as many thereof as might be necessary to pay off and discharge the entire mortgage indebtedness, be sold and the proceeds after payment of costs be applied in satisfaction of the bonds and coupons secured by such mortgages; and also for a receiver and an injunction.

Defendant Rothschilds made no answer. On April 2, 1902, the State of North Carolina and the defendant, Charles Salter, filed separate answers. North Carolina in its answer denied both the jurisdiction of this court and the title of the plaintiff; averred that the bonds were not issued in conformity with the

statute; admitted the ownership of thirty thousand shares of stock; denied that the mortgages were properly executed or that they had the effect of conveyances or transfers either in law or equity of said stock, or conferred any lien by way of pledge or otherwise upon the same; denied that she ever had any compact or agreement whatever other than that contained in the Constitution of the United States with South Dakota, or that South Dakota had ever informed North Carolina of any claim against her, or made any demand in respect to it, or any effort to settle or accommodate. Salter's answer was mainly an admission of the allegations of the bill with a claim that all the stock should be sold in satisfaction of the mortgage bonds of which he was charged to be the representative. Testimony was taken under direction of the court before commissioners agreed upon by the parties.

*Mr. Wheeler H. Peckham*, with whom *Mr. R. W. Stewart* was on the brief, for complainant:

This court has jurisdiction as the suit comes within the precise terms of Art. III of the Constitution. Where the language used in a constitution or statute is plain, clear and free from ambiguity there is no room or occasion for interpretation, and the language must be construed according to its plain meaning and intent. One citation is sufficient—*Bate Refrigerating Co.* v. *Sulzberger*, 157 U. S. 1. "*Quoties in verbis nulla est ambiguitas ibi nulla expositio contra verba fienda est.*" *Everard* v. *Poppleton*, 5 Q. B. 183; *Gadsby* v. *Barry*, 8 Scott, N. R. 804. The decision in *Chisholm* v. *Georgia*, 2 Dall. 419, that the suit would lie was the occasion for the Eleventh Amendment to the Constitution, but as it limited to the event of a citizen suing a State it became conclusive proof that, as to suits between two or more States, or suits by a State against citizens of another State, it was intended that the provisions of the original Constitution should stand. See Curtis on U. S. Const. 2d ed. 15.

A State is also liable to be sued by the United States in this

Court. *United States* v. *Texas,* 143 U. S. 621; on an action of debt. *United States* v. *North Carolina,* 136 U. S. 211.

The United States also may be sued by a State in this court pursuant to a statute. *Minnesota* v. *Hitchcock,* 185 U. S. 373, and see *Cohens* v. *Virginia,* 6 Wheat. 406.

The ground of the jurisdiction is that the States have by adopting the constitution *agreed* to submit controversies between themselves to the determination of this court. *Rhode Island* v. *Massachusetts,* 12 Pet. 720. No exception was made of any possible case which might arise. The settlement of claims by diplomacy or by war was taken away by the Constitution, and it was necessary to make some provision to take their place. Such provision was made by the organization of this court and giving it this jurisdiction. It is most just that the jurisdiction should be exercised where the plaintiff's claim is for the collection of debt; for, when a State enters into the markets of the world as a borrower, she for a time lays aside her sovereignty and becomes responsible as a civil corporation. *Louisiana* v. *Jumel,* 107 U. S. 740; *Murray* v. *Charleston,* 96 U. S. 445. The cases of New Hampshire and New York against Louisiana can be distinguished from this case.

The State of Dakota is competent to become the owner and holder of these bonds. *Texas* v. *White,* 7 Wall. 700. It is incident to the sovereign power both to draw and purchase bills. *United States* v. *Bank,* 12 Pet. 377. Also to become a donee, whether by legacy or otherwise. *Matter of Meriam,* 141 N. Y. 479, 484; *Estate of Cullom,* 5 Misc. N. Y. 173, aff'd 145 N. Y. 593; *United States* v. *Fox,* 94 U. S. 315.

Subd. 1, section 10, article II, of the Constitution, which forbids a State to enter into any agreement or compact with another State, does not affect the right of the complainant to hold these bonds; the compacts or agreements intended are of a political nature, such as could be made between sovereigns only and not ordinary business agreements. *Union Branch R. R. Co.* v. *East Tenn. & Geo. R. R.,* 14 Georgia, 327; 2 Story Com. §§ 1354 and 1401, *et seq.* A promise to pay money is not

an agreement of the character intended to be prohibited. See 4 Dall. 456; 96 U. S. 445; *Holmes* v. *Jennison,* 14 Pet. 572, citing *Vattel.*

There is nothing in the answer or proofs respecting the gift in controversy in this suit which affects the jurisdiction. The gift was absolute and the State had a right to accept it. See B. R. Curtis in N. Am. Review, January, 1844, and vol. 2, p. 93 of Curtis's Life.

It is impossible to impute to the complainant any improper motive, any more than if the gift had been by a legacy rather than by gift *inter vivos.* But motive, even in a complainant, is immaterial. The only question is, has the complainant a right? Whether acquired with good, bad or indifferent motives is quite immaterial. *Morris* v. *Tuthill,* 72 N. Y. 575; *Rice* v. *Rockefeller,* 134 N. Y. 174; *Ramsey* v. *Gould,* 57 Barb. 398; 2 Morawetz on Corporations, § 259, and cases cited; *Pender* v. *Lushington,* L. R. 6 Ch. Div. 75; *Phelps* v. *Nowlen,* 72 N. Y. 39; *McDonald* v. *Smith,* 1 Pet. 620, 624; *Barney* v. *Baltimore,* 6 Wall. 280; *Smith* v. *Kernochan,* 7 How. 198; *Dickerman* v. *Northern Trust Co.,* 176 U. S. 181; *Toler* v. *R. R. Co.,* 67 Fed. Rep. 177.

When the State owns the whole interest, legal and beneficial, in the bonds sued on, which interest it was empowered to acquire and did acquire by virtue of the act of the legislature, by a donation from individuals, it makes no difference that the motive of the donor was the hope that the State would bring suit on the bonds.

The assignment of the bonds of the defendant State to the complainant State carried with it the mortgage of the railroad stock created by the legislature of the defendant State to secure the bonds. *Converse* v. *Michigan Dairy Co.,* 45 Fed. Rep. 18.

The endorsement and delivery operated as an assignment of the mortgage and transferred to the holder of the notes the same equitable rights in the mortgage which he had in the notes. *Cooper* v. *Ulmann,* Walk. Ch. 251; *Briggs* v. *Hanno-*

*wald*, 35 Mich. 474; *Carpenter v. Longan*, 16 Wall. 271; *Kennicott v. Supervisors*, 16 Wall. 452; *Ober v. Gallagher*, 93 U. S. 199. In these cases though only a portion of the notes or bonds were acquired by the complainant the transfer enabled the complainant to foreclose, because an assignment of a part of the debt, or of one or several bonds or notes, secured by the mortgage carries with it a *proportional* interest in the mortgage.

The defendant State made a statutory mortgage to secure the whole issue of the bonds sued on. The act provided for mortgaging an equal amount of stock as collateral security for the payment of said bonds. Plainly, the whole amount of shares of stock became security for the whole amount of the bonds. 3 White and Tudor's Leading Cases in Equity, 3d Am. ed., Wallace's notes to the cases of *Row v. Dawson* and *Ryall v. Rowles*, pp. 369 and 646.

The mortgage is simply security for the debt, and whatever transfers the debt carries with it the mortgage. *English v. Carney*, 25 Michigan, 178.

A mortgage given to secure several obligations stands as security for the whole, and if a mortgagee assigns one of the obligations to a third person, the mortgage in equity stands as security for all the obligations, as well for the one assigned as those retained. *Kortlander v. Elston*, 52 Fed. Rep. 180, 183; *Matter of Bronson*, 150 N. Y. 20; *Jermain v. L. S. Ry. Co.*, 91 N. Y. 483, 492. As to undivided fractional interests in the whole, see *Flynn v. Brooklyn City R. R. Co.*, 158 N. Y. 504; *Matter of Fitch*, 160 N. Y. 94; 1 Morawetz on Corp. §§ 234, 237. As to rights of the second mortgage bondholders, see *Sager v. Tupper*, 35 Michigan, 134; *Wheeler v. Menold*, 81 Iowa, 647.

In any aspect of this case, the first and second mortgage bondholders, upon the general principles of equity, being interested in the funds, must be made parties. Story Eq. Pl. 97, 112; *Florida v. Georgia*, 17 How. 510; see also *California v. So. Pac. R. R.*, 157 U. S. 229; *Minnesota v. Northern Securities Co.*, 184 U. S. 199; *Washington State v. Northern Securities Co.*, 185 U. S. 255.

As to making the holders of first mortgage bonds parties, see *Heffner* v. *Life Ins. Co.*, 123 U. S. 747, 754, and cases cited; *Jerome* v. *McCarter*, 94 U. S. 734; *Sutherland* v. *L. S. Co.*, 1 Cent. L. Jour. 127; *McClure* v. *Adams*, 76 Fed. Rep. 899; *Murdock* v. *Woodson*, 2 Dillon, 188; *Board* v. *Min. Pt. R. R.*, 24 Wisconsin, 93; *Campbell* v. *Texas R. R.*, 2 Woods, 263.

The certificate upon the bond, with regard to security for ten shares, being no part of the statute, cannot affect the construction of the statute, as to which the rule is that what is implied in it is as much a part of it as what is expressed.

The intention of the maker of the statute being as much within the statute as it is within the letter, the court has to ascertain the meaning; which was to mortgage all the stock to secure all the bonds, each proportionately. *United States* v. *Babbitt*, 1 Black, 61; *County of Watson* v. *Nat. Bank*, 103 U. S. 770.

As to former litigation in regard to legislation of North Carolina concerning this road, see *Swasey* v. *North Carolina*, 1 Hughes, 17; *R. R. Co.* v. *Swasey*, 23 Wall. 405; *Christian* v. *Atlantic & Nor. Car. R. R. Co.*, 133 U. S. 233 For other cases as to *pro rata* distribution, *Toler* v. *East Tenn. R. R. Co.*, 67 Fed. Rep. 168; *Claflin* v. *S. C. R. R.*, 8 Fed. Rep. 118; *Pollard* v. *Bailey*, 21 Wall. 520; *Barry* v. *M. K. & T. Ry.*, 34 Fed. Rep. 829.

In such cases, equities adjudged against parties served with process are binding upon all persons of the same class, although absent from the litigation, because of the vicarious representation in the present litigants of the same class to which they belong. *Morton* v. *New Orleans R. R.*, 75 Alabama, 590, 611. See also *Knickerbocker Trust Co.* v. *Penacook Mfg. Co.*, 100 Fed. Rep. 814; *Dickerman* v. *Nor. Trust Co.*, 80 Fed. Rep. 450.

The construction of the clauses of the Constitution giving jurisdiction to this court over controversies between States and between States and citizens of other States should be liberal in the extreme to favor such jurisdiction and to carry out the beneficent purposes by the Constitution sought to be obtained.

*Mr. Robert D. Gilmer,* Attorney General of the State of North Carolina, *Mr. George Rountree, Mr. James E. Shepherd* and *Mr. James H. Merrimon* for the defendant, State of North Carolina :

· The court is without jurisdiction to make any decree against the State of North Carolina in this cause. A sovereign ·cannot be sued. *Belknap* v. *Schild,* 161 U. ·S. 10 ; *The Siren,* 7 Wall. 152 ; *Smith* v. *Weguelin,* L. R. 1869, 8 Eq. 198 ; *Briggs* v. *Light Boats,* 11 Allen, 157. This rule applies to suits brought in the Federal courts against either of the States of this Union. *Beers* v. *Arkansas,* 20 How. 527; *New Hampshire* v. *Louisiana,* 108 U. S. 76 ; *Cunningham* v. *M. & B. R. R.,* 109 U. S. 446 ; *Hans* v. *Louisiana,* 134 U. S. 1 ; *Louisiana* v. *Texas,* 176 U. S. 1. The State did not consent to the exercise of jurisdiction by pleading to the merits. *Rhode Island* v. *Massachusetts,* 12 Pet. 657 ; *Minnesota* v. *Hitchcock,* 185 U. S. 373 ; 12 Ency. Plead. & Prac. pp. 127, 188, 191 ; *Penn* v. *Lord Baltimore,* 1 Vesey, Sr. 444 ; Justice Iredell's opinion in the *Chisholm Case,* 2 Dall. 429.

Apparently, there was bill, answer and proof in *New Hampshire* v. *Louisiana,* 108 U. S. 76, and yet the court dismissed the cause for want of jurisdiction.

This court has jurisdiction of the parties, provided it be such a " controversy between two or more States "· as is contemplated in the grant of judicial power by Art. III, sec. 2, of the Constitution, and if it be not such a controversy the objection may be taken at any time. Equity Rule, 29 ; 1 Foster's Fed. Prac. 241, 249, 535, 536 ; *Indiana* v. *Tolliston Club,* 53 Fed. Rep. 18. The only authority competent to give consent for the State to be sued is the general assembly of the State. *Moody* v. *State Prison,* 128 N. Car. 12. This has not been done. If a State consents to be sued the consent can be withdrawn at any time, as it has been by the protest of the State. *Beers* v. *Arkansas,* 20 How. 527 ; *Mighell* v. *Sultan of Johore,* 1894, 1 Q. B. 149 ; Judgment of Lord Esher.

The State did not consent to be sued in a cause like this by becoming a member of the United States and subscribing to the Constitution. The present suit is not such a " controversy between two or more States " as was contemplated by the

Constitution of the United States. There are many cases in which this court has decided against the jurisdiction which seemed to come within the words of the Constitution. *Kentucky* v. *Dennison*, 24 How. 66 ; *Mississippi* v. *Johnson*, 4 Wall. 475 ; *Georgia* v. *Stanton*, 6 Wall. 50 ; *New Hampshire* v. *Louisiana*, 108 U. S. 76 ; *Wisconsin* v. *Pelican Insurance Co.*, 127 U. S. 265, 287; *Hans* v. *Louisiana*, 134 U. S. 1 ; *Louisiana* v. *Texas*, 176 U. S. 1.

The grant was of " judicial power," hence, controversies not properly subject, according to the accepted principles of jurisprudence, to judicial determination, were not included. *Louisiana* v. *Texas*, 176 U. S. 1, 18. The word " controversies " is not defined in the Constitution, but *all* controversies were not intended, because the word "all," which had been used in the preceding grants, was dropped here and purposely. 2 Bancroft's History of the Constitution, 199, 200, 212 ; *Rhode Island* v. *Massachusetts*, 12 Pet. 721.

The controversies intended by the framers of the Constitution were naturally akin to those with which they had become familiar from the experience of the colonies, such as those growing out of claims for soil, territory, jurisdiction and boundary. *United States* v. *Texas*, 143 U. S. 621, 639 ; Story on the Constitution, §§ 1674, 1675.

The dispute must arise directly between the States and not be an assumed quarrel. As to the nature of the controversy, see The Federalist, No. 80. Until recently this court has entertained jurisdiction only in boundary disputes. In each of the only two cases recently brought, *Missouri* v. *Illinois*, 180 U. S. 208; *Kansas* v. *Colorado*, 185 U. S. 125, the controversy arose directly between the contending States, and was not factitious—made by the voluntary action of the complaining State by assuming a controversy already existing and with which it had no proper concern. Practices such as were complained of in *Missouri* v. *Illinois*, and *Kansas* v. *Colorado*, as well as the cases of disputed boundary, might lead to war between independent nations ; but surely there was no absolute necessity in order to prevent an " appeal to the sword " for a tribunal to collect ordinary debts ; loans due by a State to

private individuals, and which they, being unable to collect, voluntarily assign to another State.

While writers on international law differ somewhat among themselves, many of those of greatest authority say that it is the practice of nations, when petitioned by their citizens, to intervene for the enforcement of obligations due by other nations to them, to make a distinction between such obligations as are contractural—loans voluntarily entered into with a knowledge of all the risks and the inability of collection by suit—and such as are tortious. They generally refuse to interfere for the collection of debts, but do, for the redress of other kinds of grievances. 1 Halleck International Law, 435, and note; Hall's International Law, 3d ed. 277; *New Hampshire* v. *Louisiana*, 108 U. S. 76.

And such has been the practice of England and the United States. Wharton's Digest Int. Law, § 231; 5 Am. State Papers, 1823 (For. Rel.), 403; British Quarterly Review, Jan. 1876, p. 54; Mr. Balfour in the House of Commons, December 15, 1902, as to Venezuelan question.

But it is understood that the contention of complainant's counsel is that this suit is brought in vindication of its property rights, and there are several cases in which this court has entertained original bills to protect the proprietary rights of a State against injury or infringement by *individuals*, such as *Georgia* v. *Brailsford*, 2 Dall. 402; *Pennsylvania* v. *Wheeling Bridge Company*, 13 How. 618; *Texas* v. *White*, 7 Wall. 700; *Florida* v. *Anderson*, 91 U. S. 667; *Alabama* v. *Burr*, 115 U. S. 413.

The fact that the suit is brought in vindication of the property rights of the complaining State is also not conclusive. In *New Hampshire* v. *Louisiana*, 108 U. S. 76, and *Wisconsin* v. *Pelican Insurance Co.*, 127 U. S. 265, property rights were involved; but the court declined jurisdiction on account of the nature of the title and the method and purpose of its acquirement, and see as to validity of assignment, *Walker* v. *Bradford Bank*, 12 Q. B. D. 1883, 84, 511.

As to the sovereignty of the States, see *Pennoyer* v. *Neff*, 95 U. S. 714; *Lane County* v. *Oregon*, 7 Wall. 71; *Martin* v. *Hunter*, 1 Wheat. 325; *Buckner* v. *Finaley*, 2 Pet. 586; Cooley

Const. Lim. 29 ; The. Federalist, XXXII; Woodrow Wilson, The State, 469 ; *Mayor &c.* v. *Miln*, 11 Pet. 102 ; *United States* v. *Guthrie*, 17 How. 284 ; *Stanley* v. *Schwalby*, 147 U. S. 508 ; *Kentucky* v. *Denison*, 24 How. 66 ; *Cherokee Nation* v. *Georgia*, 5 Pet. 1.

As to the general rule of sovereignty the nature of things opposes the opinion that the judicial tribunals should be competent to determine that the government is a debtor.   Dalloz Jur. Gen. Verbo. Tresor. Pub., No. 383 ; Dufour, Droit, Adm't, 4, 629 ; 3 Proudhon Dom. de Prop., No. 826, p. 67.

The history of our country shows that the government has habitually determined the claims to be adjusted ; the medium of payment, and the persons to be paid ; Confederations, Union and States have exercised their sovereign rights.   Hamilton's Report in 1792 and 1795 ; 2 Cong. Annals, 1792 ; 3 Cong. Annals, 1362 ; 2 Pitkin Civil Hist. 336 ; 3 Writings Gallatin, 121, 143 ; Ordronaux on Constitutional Legislation, 283. .

A State is not liable to suit upon its bonds either by an individual or another State.   Such suits against States were unheard of at the time of the adoption of the Constitution and the power to bring them would not have been included if the proposition had been made.   *Bank of Washington* v. *Arkansas*, 20 How. 530, 532 ; Webster's Opinion to Baring Bros. & Co., 1836, Works, vol. 1, p. 637 ; *Briscoe* v. *Bank*, 11 Pet. 257, 321 ; *Crouch* v. *Credit Foncier*, 8 Q. B. 1872, 73, 374, 384; Hamilton's Report, 1795; Annals of Cong. 1793, 5, 3d Congress, p. 1635.

What was not contemplated by the framers of the Constitution is not included in the grant of judicial power.   Campbell, J., in dissenting opinion, *Florida* v. *Georgia*, 17 How. 513. This view was apparently adopted by Marshall, C. J., in his decision as to the status of Indian tribes, in *Cherokee Nation* v. *Georgia*, 5 Pet. 1.

A suit cannot usually be maintained against a State to compel the payment of its debts, as it might necessitate an interference with, if not the complete control and direction of, the legislative function of assessing, levying, collecting and distributing taxes, which is, as yet, beyond the competency of courts ; there is no means of rendering the decree effective,

unless this court is prepared to appoint a receiver with the extraordinary powers of taking charge of and administering the affairs of a delinquent State.  The separation and careful demarkation of the functions of government into executive, legislative and judicial, is the distinguishing characteristic of our Constitution, state and national, and neither department can transgress its proper bounds.  *People ex rel. Broderick* v. *Morton,* 156 N. Y. 136 ; *Cherokee Nation* v. *Georgia,* 5 Pet. 1 ; Dicey on Conflict of Laws, 38 ; Miller on the Constitution, 314, and notes by Davis to same, 423 ; Justice Iredell's dissent in *Chisholm's Case,* 2 Dall. 445 ; *United States* v. *North Carolina,* 136 U. S. 211 ; cited in *United States* v. *Texas,* 143 U. S. 642, is not controlling as the State consented to be sued.  Dicey on Conflict of Laws, 212 ; see *United States* v. *Guthrie,* 17 How. 284, 303.  The States are sovereign within the province of their reserved powers, including the management of their fiscal affairs.  By the constitution of North Carolina, Art. 14, sec. 3, " no money shall be drawn from the treasury but in consequence of appropriations made by law ;" and the courts cannot direct the State Treasury to pay a claim against the State, however just and unquestioned, where there is no legislative appropriation to pay the same.  *Garner* v. *Worth,* 122 N. C. 250 ; *Railroad* v. *Jenkins, Treasurer,* 68 N. C. 499 ; *Shaffer* v. *Jenkins, Treasurer,* 72 N. C. 275.

In many of the cases in this court in which attempts have been made to collect debts from States, there have been strong intimations that over and above the objection that States are exempt from suit by the Eleventh Amendment, courts had no process by which they could collect debts from States.  *Marye* v. *Parsons,* 114 U. S. 325 ; *In re Ayers,* 123 U. S. 443, 491 ; *Rees* v. *City of Watertown,* 19 Wall. 107 ; see also *Heine* v. *The Levee Commissioners,* 19 Wall. 655, 661; 8 Rose's Notes on United States Reports, 233 ; W. H. Burroughs in Virginia Law Journal, March, 1879.  The fact that there is property mortgaged to secure the bonds does not relieve the court from being obliged to take charge of the treasury of the State.  See *Northwestern M. L. Assn.* v. *Keith* as to Equity Rule 92 as to deficiency judgment.  This court

rather than merely adjudge the indebtedness leaving it optional with the defendant State to pay it will decline to take jurisdiction at all. *Kentucky* v. *Dennison,* 24 How. 66 ; no court sits to determine law *in thesi.* *Marye* v. *Parsons,* 114 U. S. 330 ; *Broderick* v. *Morton,* 156 N. Y. 136.

If a suit can be brought upon the bonds of a State by another State, no such suit can be brought upon bonds transferred to the State merely because the holder of them cannot collect them.

If for any reason the court can take jurisdiction of a suit against a State for the collection of a debt its compulsive process should be confined to debts due directly to the complaining States upon dealings, contracts, transactions between the States, or at any rate to obligations acquired "in due course of trade," if such an acquisition be possible. 1 Kent's Commentaries, 297, note *d* ; Langdell's Treatise on Equity Pleading, 209 ; and see Fed. Cas. No. 1007.

Jurisdiction over controversies between two or more States was given to the Supreme Court for the purpose of settling disputes—allaying strife—and not for the purpose of fomenting quarrels. What surer method of arousing jealousies, engendering hostilities and retaliations can be conceived than by encouraging such suits between States ? Such, at any rate, is the teaching of experience.

A sovereign State cannot be forced into court against her consent ; but a cross bill presupposes that the plaintiff is already in court rightfully, and when the State comes into court of her own accord and invokes its aid, she is, of course, bound by all the rules established for the administration of justice between individuals. *P. R. & A. Ry. Co.* v. *So. Car.,* 60 Fed. Rep. 552 ; *Prioleau* v. *United States,* L. R. 2 Eq. 659 ; *The Siren,* 7 Wall. 152, and see also for illustrations of these principles, *Brent* v. *Bank of Washington,* 10 Pet. 596 ; *United States* v. *Bank of Metropolis,* 15 Pet. 377 ; *The Davis,* 10 Wall. 15 ; *United States* v. *Ingate,* 48 Fed. Rep. 251 ; *United States* v. *Flint,* Fed. Cas. No. 15,121 ; *United States* v. *Wilder,* Fed. Cas. No. 16,694 ; *United States* v. *Union Nat. Bank,* Fed. Cas. No. 16,597 ; *United States* v. *Barker,* Fed.

Cas. No. 14,520. Although a government, state or national, is not barred by the statute of limitations, a claim barred by the statute and assigned to the government cannot be sued on, as it has no more validity after than before the assignment. *United States* v. *Buford,* 3 Pet. 12; *United States* v. *N. C. & St. L. R. Co.,* 118 U. S. 125; 1 Cooley's Blackstone, 247, note 6. A contract cannot be assigned if by the assignment a greater obligation is thereby imposed. *Tolehurst* v. *Ass. Port. Cement Mfrs.,* 1901, 2 K. B. 811; 18 Law Quarter. Review, 10; Dicey on Conflict of Laws, 534; *Edwards* v. *Kearsey,* 96 U. S. 595, 600; *Chisholm's Case,* opinion of Jay, Ch. J. 2 Dall. 479; Pollock on Contracts, 294; *Hager* v. *Swayne,* 149 U. S. 242, 248; *Ball* v. *Halsey,* 161 U. S. 72, 80.

The adoption of the Eleventh Amendment and the alarm over the decision in the *Chisholm* case was not so much the apprehension of a loss of dignity in being haled before a court, as the danger of being compelled, by legal process, to pay their debts—the danger of having their complex fiscal affairs taken out of the control of the proper state officers and placed in the hands of this court. *Cohens* v. *Virginia,* 6 Wheat. 246, 406, and see Alexander Hamilton in The Federalist No. 81; Miller on the Constitution, 382, and Davis's notes to same, 652, 653; Judson's Constitutional History of United States, 255. Individuals should not be allowed to enforce compromises for one State by threat of assignment to another State. Taking jurisdiction of this action would result in a vast number of similar claims being made which would not be confined exclusively to public securities but would extend to claims of all kinds. What then becomes of the reserved rights of the States to manage their own domestic affairs? There is scarcely any State which may not be thus called to the bar of this court. Even in Massachusetts claims have been made which the Supreme Court of that State regarded as just, as between man and man, but which it could not enforce against the State for lack of jurisdiction. *Murdock Grate Co.* v. *Commonwealth,* 152 Massachusetts, 28.

There is no absolute necessity for such jurisdiction in this

court; we have lived for more than a century without its exercise; that it does not exist is made probable by the fact that it has not previously been invoked, although the circumstances which gave rise to it have existed from the beginning. The novelty of an action, under such circumstances, is strong evidence that it is groundless. *Mississippi* v. *Johnson*, 4 Wall. 475, 500; *Mogul Case* (1892), A. C. 25. And see article by Carmon F. Randolph, in the number of the Columbia Law Review, May, 1902, "Notes on Suits Between States."

Even if suits can be brought against a State upon bonds so assigned to another State, the present suit cannot be maintained, because it is a suit by the State of South Dakota and an individual representing all individual bondholders of the same class, against the State of North Carolina and another representing all the first mortgage bondholders. 1 Daniel's Chancery Practice, 6th Am. ed. 191, note; as to Judiciary Act of 1789, see *Coal Co.* v. *Blatchford*, 11 Wall. 172; but under the act of 1875, see *Removal Cases*, 100 U. S. 457; 9 Rose's Notes, 850; *Osborne* v. *The Bank*, 9 Wheat. 739, has been overruled on the point that the court would look to the parties on the record and the court will now look beyond to the result of the suit. *In re Ayres*, 123 U. S. 443; *Missouri &c. Ry. Co.* v. *Missouri Road &c. Commrs.*, 183 U. S. 59. The original jurisdiction of this court is limited and should be sparingly exercised. *California* v. *Southern Pacific Ry. Co.*, 157 U. S. 261; *Florida* v. *Georgia*, 17 How. 478, 504.

The Circuit Court has no jurisdiction unless each one of the plaintiffs arranged according to their real interest can maintain a suit against each one of the defendants, arranged according to their real interest in the controversy. *Removal Cases*, 100 U. S. 457; *Strawbridge* v. *Curtiss*, 3 Cranch, 267; *Smith* v. *Lyon*, 133 U. S. 319. In *New Orleans Pacific Railway* v. *Parker*, 143 U. S. 58, if a suit is instituted between competent persons, others having the requisite interest are entitled to intervene, and if they do intervene, and do not have the requisite diversity of citizenship, the jurisdiction of the court is ousted. *Mangles* v. *Donan Brewing Co.*, 53 Fed. Rep. 515; Cook on Stockholders, 3d ed. sec. 827, note 2; *Morris* v. *Gilmer*, 129

U. S. 315; *Tug River C. & S. Co.* v. *Brigel,* 67 Fed. Rep. 625; *Consolidated Water Co.* v. *Babcock,* 76 Fed. Rep. 243, 248; *Board of Trustees* v. *Blair,* 70 Fed. Rep .416.

If this be required merely because the Judiciary Act only confers jurisdiction on the Circuit Court of controversies between the citizens of different States, *a fortiori,* ought it to be so held when the Constitution confers jurisdiction upon this court only of controversies between two or more States and the Eleventh Amendment expressly prohibits suits by individuals against a State?

Nor is it possible to escape the force of this argument by saying that the individuals are not necessary parties to the suit. It would scarcely lie in the mouth of the complainant to say this, because she has elected to bring the suit in the present form and with the present parties, but, if she did, the objection would be futile, because they are necessary parties. *California* v. *Southern Pacific Ry. Co.,* 157 U. S. 229, 257; *Minnesota* v. *Northern Securities Co.,* 184 U. S. 199.

Even if the parties were re-arranged according to their real interest in the controversy, the result of a successful prosecution of this suit will equally be to enable the individual holders of the second mortgage bonds to collect them from the State by suit against her consent, contrary to the provisions of the Eleventh Amendment, which would contravene the spirit of the amendment.

The general rule for the construction of a constitutional provision is so to construe it as to subserve its general purpose, *Legal Tender Cases,* 12 Wall. 531, and that rule has been applied with liberality to the Eleventh Amendment. *Fitts* v. *McGhee,* 172 U. S. 516, 528; dissent of Bradley, J., in *Virginia Coupon Cases,* 114 U. S. 332; *Hans* v. *Louisiana,* 134 U. S. 1. The Constitution prohibits things—not names. *Craig* v. *Missouri,* 4 Pet. 410, 435.

That which cannot be done directly cannot be done indirectly—the immunity of a sovereign from suit is not easily to be destroyed. In the *Parlement Belge,* 5 L. R. P. D. 197, 219, a libel was dismissed against a public ship although the sovereign was not a defendant; and see *Cunningham* v. *M.*

& B. R. R., 109 U. S. 446; *Mighell* v. *Sultan of Johore*, (1894) 1 Q. B. 149, 154; *Jarbolt* v. *Moberly*, 103 U. S. 580, 585; *Ex parte Garland*, 4 Wall. 334, 338.

To sustain this action and give judgment in accordance with the prayer will be to accomplish an unconstitutional result, and that by indirection.

This suit is commenced and prosecuted by, or for the bene-fit of, individuals. Under *New Hampshire* v. *Louisiana*, 108 U. S. 76, 89, an individual cannot invoke the original juris-diction of this court in a suit against one State by using the name of another State—a State cannot maintain a suit against another State on behalf of private individuals.

The facts clearly show that the suit was commenced, and is prosecuted, solely for the benefit of the private bondholders, and in the event of recovery they are the sole beneficiaries after deducting, of course, the expenses of the suit, including the fee to South Dakota. The prohibitions of the Eleventh Amendment can not so easily be nullified.

On the merits; the bonds were disposed of contrary to the provisions of the enabling statute, c. 228, Acts North Caro-lina, 1854, 55, and are, therefore, illegal and uncollectible. See §§ 8, 35, 37.

As to the position of complainant that whether the bonds were illegally issued and sold or not, is immaterial to a holder for value in due course, it must be, of course, through the merit of some antecedent holder, for complainant not only took the bonds after their maturity, but paid nothing for them.

Admitting presumptions in favor of a holder of negotiable paper, the law is that when proof has been given of fraud or illegality in the issue of paper, the burden is cast upon com-plainant to show that it is a purchaser for value without notice and in due course. *Smith* v. *Sac County*, 11 Wall. 139; *Combs* v. *Hodge*, 21 How. 397; *Collins* v. *Gilvert*, 94 U. S. 753; *Stewart* v. *Lansing*, 104 U. S. 505.

As these bonds were issued and disposed of contrary to the provisions of the enabling statute, they were illegal, and com-plainant's receiving the bonds as a donation, and after their maturity, casts the burden of proof upon her to show that some

one of her predecessors in title were innocent purchasers for value, and this she has not done.

As the Schafers, who are the only persons whose title complainant rests upon, purchased these state bonds with overdue interest coupons attached and at a small percentage of their face value, they are deprived of the protection given to *bona fide* purchasers for value in due course. *Hulbert* v. *Douglas,* 94 N. C. 122; *Farthing* v. *Dark,* 109 N. C. 291; *Parsons* v. *Jackson,* 99 U. S. 434, 444; 9 Rose's Notes, 737; *Railway Co.* v. *Sprague,* 103 U. S. 756; *London Joint Stock Bank* v. *Simmons,* 1892, A. C. 201, 221. The circumstances were sufficient to put a reasonable person on notice that there was something wrong, and inquiry would have disclosed that they were not issued in accordance with the statute. *Trask* v. *Jacksonville &c. R. R. Co.,* 124 U. S. 515.

If, however, the Schafers were *bona fide* holders for value, as the bonds were not suable in their hands, they ought not to become suable in the hands of a transferee unless that transferee took them for value and without notice of dishonor, even if such controversies are within the jurisdiction of this court. A transferee has no higher or further rights than the transferrer, unless in the exceptional cases under our recording acts and negotiable paper taken for value before maturity and without notice. To permit the State of South Dakota to collect these bonds by suit, whether they were illegally issued or not, will be to add another exception to the rule that a man cannot give what he does not own or possess.

The provisions of the law, Act, 1866, '67, North Carolina, chapter 106, authorizing a mortgage upon the State's stock in the North Carolina Railroad in favor of the holders of the bonds of the class sued on were not complied with, and the mortgage is invalid.

In the indorsement upon the bonds, purporting to give a statutory mortgage upon the State's stock, no stock was designated or described in such way as to be capable of identification, and, therefore, no particular stock has been subjected to the lien of a mortgage. The statute authorized a mortgage in favor of the holders of the bonds, but it has never been exe-

cuted, and the only claim which the holders of the mortgage have against the State is, not a lien upon any particular stock owned by the State, but a cause of action for the breach of contract to give the mortgage. In North Carolina, by whose law the validity of the mortgage is to be determined, a mortgage purporting to be upon a certain number of things, out of a larger number, and in no other wise designated, is invalid as a mortgage. *Waldo* v. *Belcher*, 11 Iredell L. 609 ; *Blackley* v. *Patrick*, 67 N. C. 40 ; *Stevenson* v. *Railroad*, 86 N. C. 445 ; *Holmes* v. *Whitaker*, 119 N. C. 113 ; Jones on Chattel Mortgages, 56 ; *Kilgore* v. *New Orleans Gas Co.*, 2 Woods, 144.

The claim on behalf of the mortgage is not stronger in equity than at law, because in order to constitute an equitable mortgage, it is equally necessary to identify the subject-matter. *Halroyd* v. *Marshall*, 10 H. L. 189 ; *Walker* v. *Brown*, 165 U. S. 654 ; 19 Enc. of Law, page 14, and authorities. The same rule prevails in actions for the specific performance of a contract. *Lighthouse* v. *Third National Bank*, 162 N. Y. 336. The law is the same, whether the alleged mortgage be statutory or conventional. Jones on Liens, § 106 ; *Tycross* v. *Dreyfus*, 5 Ch. Div. 605.

If the court has jurisdiction of the cause, and complainant is entitled to recover anything, she is not entitled to recover interest upon overdue coupons. *United States* v. *North Carolina*, 136 U. S. 211.

*Mr. Daniel L. Russell*, with whom *Mr. Marion Butler* and *Mr. Alfred Russell* were on the brief, for defendant Charles Salter and the second mortgage bondholders.

The first and second mortgage bondholders being interested in the funds must be made parties to the suit, citing cases on complainant's brief and Jones on Mortgages, § 1369; *Wilkins* v. *Frye*, 1 Mer. 244, 262 ; *Hancock* v. *Hancock*, 22 N. Y. 568; *Carpenter* v. *O'Dougherty*, 58 N. Y. 681 ; *Rankin* v. *Major*, 9 Iowa 297 ; *Thayer* v. *Campbell*, 9 Missouri, 280. The second mortgage is *in solido* and not a separate and independent mortgage of ten shares for each bond. See cases cited in complainant's brief. The motives of the donor in making the gift

to the complainant State are not material.    See cases cited in
complainant's brief.    As to the turpitude of repudiation and
the obligation of a State to pay its debts, see *Louisiana* v.
*Jumel,* 107 U. S. 740 ; *Murray* v. *Charleston,* 96 U. S. 445.

MR. JUSTICE BREWER, after making the foregoing statement,
delivered the opinion of the court.

There can be no reasonable doubt of the validity of the
bonds and mortgages in controversy.    There is no challenge
of the statutes by which they were authorized.    By those
statutes the treasurer was directed, when it became necessary
to borrow money for the payment of the subscription, to pre-
pare coupon bonds and advertise in one or more newspapers
for sealed proposals, and to accept the terms offered most ad-
vantageous to the State, provided that in no event should the
bonds be sold for less than their par value.    The advertisement
was made, no bids were received, but the bonds were delivered
to the railroad company as payment for the subscription,
dollar for dollar.    Upon each bond was placed the statutory
pledge or mortgage.    It is true no money was paid into the
treasury and thence out of the treasury to the railroad com-
pany, yet looking at the substance of the transaction (and
equity has regard to substance rather than form), the transac-
tion was the same as though the company had been the only
bidder, had placed a thousand dollars in the treasury in pay-
ment of each bond and received that thousand dollars back
from the treasury in payment of the subscription for ten shares
of stock.    It is true also that there was no formal issue of cer-
tificates by the company to the State, but that was a matter of
arrangement between the parties to the subscription.    The
State's right as a stockholder was not abridged by lack of the
certificates, and in fact it has been receiving dividends on the
stock exactly as though certificates had been issued.    The stat-
ute also provided that with each several bond a deed of mort-
gage for an equal amount of stock, signed by the treasurer and
countersigned by the comptroller, should constitute a part of
the bond and be transferable in like manner with it, "and
further, that such mortgage shall have all the force and effect

in law and equity, of registered mortgages without actual registry." While no certificate of stock was to be attached to or go with the bond the statute evidently contemplated that the mortgage endorsed on the bond should have the same force and effect. Hence, when the endorsement was made and the bond issued by the State it was tantamount to a separation and identification of the number of shares named therein. It cannot be that the State having provided this means of giving to each bond the mortgage security of the corresponding shares of stock can now prevent the attaching of the lien on the ground that no shares had been separated and no certificate transferred. It is unnecessary to refer to chap. 98 of the Laws of 1879, for that act was one in the nature of an offer to compromise, although it does contain a recognition of outstanding obligations.

Neither can there be any question respecting the title of South Dakota to these bonds. They are not held by the State as representative of individual owners, as in the case of *New Hampshire* v. *Louisiana*, 108 U. S. 76, for they were given outright and absolutely to the State. It is true that the gift may be considered a rare and unexpected one. Apparently the statute of South Dakota was passed in view of the expected gift, and probably the donor made the gift under a not unreasonable expectation that South Dakota would bring an action against North Carolina to enforce these bonds, and that such action might enure to his benefit as the owner of other like bonds. But the motive with which a gift is made, whether good or bad, does not affect its validity or the question of jurisdiction. This has been often ruled. In *McDonald* v. *Smalley*, 1 Pet. 620, an objection to the jurisdiction on the ground that the title to the property in controversy had been conveyed to the plaintiff in the belief that it would be sustained by the Federal when it would not be by the state court, was overruled, with this observation by Chief Justice Marshall (p. 624):

"This testimony, which is all that was laid before the court, shows, we think, a sale and conveyance to the plaintiff, which was binding on both parties. McDonald could not have main-

tained an action for his debt, nor McArthur a suit for his land. His title to it was extinguished, and the consideration was received. The motives which induced him to make the contract, whether justifiable or censurable, can have no influence on its validity. They were such as had sufficient influence with himself, and he had a right to act upon them. A court cannot enter into them when deciding on its jurisdiction. The conveyance appears to be a real transaction, and the real as well as nominal parties to the suit, are citizens of different States."

See also *Smith* v. *Kernochen*, 7 How. 198; *Barney* v. *Baltimore*, 6 Wall. 280; *Dickerman* v. *Northern Trust Co*, 176 U. S. 181, 190, 191, 192. In this last case Mr. Justice Brown, speaking for the court, said :

" If the law concerned itself with the motives of parties new complications would be introduced into suits which might seriously obscure their real merits. If the debt secured by a mortgage be justly due, it is no defence to a foreclosure that the mortgagee was animated by hostility or other bad motive. *Davis* v. *Flagg*, 35 N. J. Eq. 491; *Dering* v. *Earl of Winchelsea*, 1 Cox Ch. 318; *McMullen* v. *Ritchie*, 64 Fed. Rep. 253, 261; *Toler* v. *East Tenn. &c. Railway*, 67 Fed. Rep. 168. . . . The reports of this court furnish a number of analogous cases. Thus, it is well settled that a mere colorable conveyance of property, for the purpose of vesting title in a non-resident and enabling him to bring suit in a Federal court, will not confer jurisdiction; but if the conveyance appear to be a real transaction, the court will not, in deciding upon the question of jurisdiction, inquire into the motives which actuated the parties in making the conveyance. *McDonald* v. *Smalley*, 1 Pet. 620; *Smith* v. *Kernochen*, 7 How. 198; *Barney* v. *Baltimore*, 6 Wall. 280; *Farmington* v. *Pillsbury*, 114 U. S. 138; *Crawford* v. *Neal*, 144 U. S. 585.

" The law is equally well settled that, if a person take up a *bona fide* residence in another State, he may sue in a Federal court, notwithstanding his purpose was to resort to a forum of which he could not have availed himself if he were a resident of the State in which the court was held. *Cheever* v.

*Wilson,* 9 Wall. 108, 123; *Briggs* v. *French,* 2 Sumn. 251; *Catlett* v. *Pacific Ins. Co.,* 1 Paine, 594; *Cooper* v. *Galbraith,* 3 Wash. 546; *Johnson* v. *Monell,* Wool. 390."

The title of South Dakota is as perfect as though it had received these bonds directly from North Carolina. We have, therefore, before us the case of a State with an unquestionable title to bonds issued by another State, secured by a mortgage of railroad stock belonging to that State, coming into this court and invoking its jurisdiction to compel payment of those bonds and a subjection of the mortgaged property to the satisfaction of the debt.

Has this court jurisdiction of such a controversy, and to what extent may it grant relief? Obviously that jurisdiction is not affected by the fact that the donor of these bonds could not invoke it. The payee of a foreign bill of exchange may not sue the drawer in the Federal court of a State of which both are citizens, but that does not oust the court of jurisdiction of an action by a subsequent holder if the latter be a citizen of another State. The question of jurisdiction is determined by the status of the present parties, and not by that of prior holders of the thing in controversy. Obviously, too, the subject-matter is one of judicial cognizance. If anything can be considered as justiciable it is a claim for money due on a written promise to pay—and if it be justiciable does it matter how the plaintiff acquires title, providing it be honestly acquired? It would seem strangely inconsistent to take jurisdiction of an action by South Dakota against North Carolina on a promise to pay made by the latter directly to the former, and refuse jurisdiction of an action on a like promise made by the latter to an individual and by him sold or donated to the former.

A preliminary question arises from the fact that representatives of the two classes of bonds are made defendants, and that a part of the relief asked is a sale of the thirty thousand shares of stock of the North Carolina Railroad Company, belonging to the State of North Carolina, in satisfaction and discharge of all the mortgages upon such stock. It is insisted

that these individuals, owners of the bonds, although named as defendants, are in fact occupying an adverse position to that of the State, and that the effect of their presence as parties is a practical nullification of the Eleventh Amendment, in that it is giving to individuals relief by judgment against the State. Apparently one expectation of the donor to South Dakota was that in some way the bonds retained by himself would be placed in judgment and relief obtained against North Carolina in the suit commenced by South Dakota. But we think that these individuals are not necessary parties-defendant, and that no relief should be given to them or to the classes of bondholders they represent. The statute under which the mortgage was executed provided that with each of the bonds a deed of mortgage for a like amount of stock should be executed by the State. There is, therefore, a separate mortgage of ten shares of stock on each one of these bonds, and that mortgage can be fully satisfied by a decree of foreclosure and sale of the ten shares of stock. No one would doubt that, if a certificate of stock was attached as a pledge to a note, the pledge could be satisfied by a sale of the stock without any determination of the rights of the purchaser as between himself and other stockholders. And such was the manifest purpose of this legislation. It contemplated that each bondholder should receive a stock security which he could realize on without the delay and expense of a suit to which all other stockholders and the corporation would be necessary parties. The purchaser at the sale to be authorized by this decree will become vested with the full title of the State to the number of shares of stock stated in the mortgage. He will occupy the same position in relation to the corporate property that other stockholders occupy, and have whatever rights they have. It is not necessary for a full satisfaction of the mortgage on one of these bonds that any other mortgage upon another bond be also foreclosed, or that a decree be entered determining what rights the purchaser will have by virtue of the stock which he obtains at the sale. So far then as these individual defend-

ants are concerned, the suit will be dismissed with costs against South Dakota.

Coming now to the right of South Dakota to maintain this suit against North Carolina, we remark that it is a controversy between two States; that by sec. 2, art. III, of the Constitution this court is given original jurisdiction of "controversies. between two or more States." In *Missouri* v. *Illinois and the Sanitary District of Chicago*, 180 U. S. 208, Mr. Justice Shiras, speaking for the court, reviewed at length the history of the incorporation of this provision into the Federal Constitution and the decisions rendered by this court in respect to such jurisdiction, closing with these words (p. 240):

"The cases cited show that such jurisdiction has been exercised in cases involving boundaries and jurisdiction over lands and their inhabitants, and in cases directly affecting the property rights and interests of a State."

The present case is one "directly affecting the property rights and interests of a State."

Although a repetition of this review is unnecessary, two or three matters are worthy of notice. The original draft of the Constitution reported to the convention gave to the Senate jurisdiction of all disputes and controversies "between two or more States, respecting jurisdiction or territory," and to the Supreme Court jurisdiction of "controversies between two or more States, except such as shall regard territory or jurisdiction." A claim for money due being a controversy of a justiciable nature, and one of the most common of controversies, would seem to naturally fall within the scope of the jurisdiction thus intended to be conferred upon the Supreme Court. In the subsequent revision by the convention the power given to the Senate in respect to controversies between the States was stricken out as well as the limitation upon the jurisdiction of this court, leaving to it in the language now found in the Constitution jurisdiction without any limitation of "controversies between two or more States."

The Constitution as it originally stood also gave to this

court jurisdiction of controversies "between a State and citizens of another State." Under that clause *Chisholm* v. *Georgia*, 2 Dall. 419, was decided, in which it was held that a citizen of one State might maintain in this court an action of assumpsit against another State. In consequence of that decision the Eleventh Amendment was adopted, which provides that "the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State." It will be perceived that this amendment only granted to a State immunity from suit by an individual, and did not affect the jurisdiction over controversies between two or more States. In respect to this it was said by Chief Justice Marshall in *Cohens* v. *Virginia*, 6 Wheat. 264, 406:

"It is a part of our history, that, at the adoption of the Constitution, all the States were greatly indebted; and the apprehension that these debts might be prosecuted in the Federal courts formed a very serious objection to that instrument. Suits were instituted; and the court maintained its jurisdiction. The alarm was general; and, to quiet the apprehensions that were so extensively entertained, this amendment was proposed in Congress, and adopted by the state legislatures. That its motive was not to maintain the sovereignty of a State from the degradation supposed to attend a compulsory appearance before the tribunal of the nation, may be inferred from the terms of the amendment. It does not comprehend controversies between two or more States, or between a State and a foreign State. The jurisdiction of the court still extends to these cases: and in these a State may still be sued. We must ascribe the amendment, then, to some other cause than the dignity of a State. There is no difficulty in finding this cause. Those who were inhibited from commencing a suit against a State, or from prosecuting one which might be commenced before the adoption of the amendment, were persons who might probably be its creditors. There was not much reason to fear that foreign or sister States would

be creditors to any considerable amount, and there was reason to retain the jurisdiction of the court in those cases, because it might be essential to the preservation of peace. The amendment, therefore, extended to suits commenced or prosecuted by individuals, but not to those brought by States."

In the same case, after referring to the two classes of cases, jurisdiction of which was vested in the courts of the Union, he said (p. 378):

"In the second class, the jurisdiction depends entirely on the character of the parties. In this are comprehended 'controversies between two or more States, between a State and citizens of another State,' and 'between a State and foreign States, citizens or subjects.' If these be the parties it is entirely unimportant what may be the subject of controversy. Be it what it may, these parties have a constitutional right to come into the courts of the Union."

In *Rhode Island* v. *Massachusetts*, 12 Pet. 657, this court sustained its jurisdiction of a suit in equity brought by one State against another to determine a dispute as to boundary, and in the course of the opinion, by Mr. Justice Baldwin, said in respect to the immunity of a sovereign from suit by an individual (p. 720):

"Those States, in their highest sovereign capacity, in the convention of the people thereof, . . . adopted the Constitution, by which they respectively made to the United States a grant of judicial power over controversies between two or more States. By the Constitution, it was ordained that this judicial power, in cases where a State was a party, should be exercised by this court as one of original jurisdiction. The States waived their exemption from judicial power, (6 Wheat. 378, 380,) as sovereigns by original and inherent right, by their own grant of its exercise over themselves in such cases, but which they would not grant to any inferior tribunal. By this grant, this court has acquired jurisdiction over the parties in this cause, by their own consent and delegated authority; as their agent for executing the judicial power of the United States in the cases specified."

And, again, in reference to the extent of the jurisdiction of this court (p. 721):

" That it is a controversy between two States, cannot be denied ; and though the Constitution does not, in terms, extend the judicial power to *all* controversies between two or more States, yet, it in terms excludes *none* whatever may be their nature or subject."

In *United States* v. *North Carolina*, 136 U. S. 211, we took jurisdiction of an action brought by the United States against North Carolina to recover interest on bonds, and decided the case upon its merits. ,It is true there was nothing in the opinion in reference to the matter of jurisdiction, but as said in *United States* v. *Texas*, 143 U. S. 621, 642 :

" The cases in this court show that the framers of the Constitution did provide, by that instrument, for the judicial determination of all cases in law and equity between two or more States, including those involving questions of boundary. Did they omit to provide for the judicial determination of controversies arising between the United States and one or more of the States of the Union ? This question is in effect answered by *United States* v. *North Carolina*, 136 U. S. 211. That was an action of debt brought in this court by the United States against the State of North Carolina upon certain bonds issued by that State. The State appeared, the case was determined here upon its merits and judgment was rendered for the State. It is true that no question was made as to the jurisdiction of this court, and nothing was therefore said in the opinion upon that subject. But it did not escape the attention of the court, and the judgment would not have been rendered except upon the theory that this court has original jurisdiction of a suit by the United States against a State."

See also *United States* v. *Michigan*, 190 U. S. 379, decided at the last term, in which a bill in equity for an accounting and a recovery of money was sustained. Mr. Justice Peckham, delivering the unanimous opinion of the court, said (pp. 396, 406) :

" By its bill the United States invokes the original jurisdiction of this court for the purpose of determining a controversy existing between it and the State of Michigan. This court has jurisdiction of such a controversy, although it is not lit-

erally between two States, the United States being a party on the one side, and a State on the other. This was decided in *United States* v. *Texas*, 143 U. S. 611, 642. . . . There must be judgment overruling the demurrer, but as the defendant may desire to set up facts which it might claim would be a defence to the complainant's bill, we grant leave to the defendant to answer up to the first day of the next term of this court. In case it refuses to plead further, the judgment will be in favor of the United States for an accounting and for the payment of the sum found due thereon."

We are not unmindful of the fact that in *Hans* v. *Louisiana*, 134 U. S. 1, Mr. Justice Bradley, delivering the opinion of the court, expressed his concurrence in the views announced by Mr. Justice Iredell, in the dissenting opinion in *Chisholm* v. *Georgia*, but such expression cannot be considered as a judgment of the court, for the point decided was that, construing the Eleventh Amendment according to its spirit rather than by its letter, a State was relieved from liability to suit at the instance of an individual, whether one of its own citizens or a citizen of a foreign State. Without noticing in detail the other cases referred to by Mr. Justice Shiras in *Missouri* v. *Illinois et al.*, *supra*, it is enough to say that the clear import of the decisions of this court from the beginning to the present time is in favor of its jurisdiction over an action brought by one State against another to enforce a property right. *Chisholm* v. *Georgia* was an action of assumpsit, *United States* v. *North Carolina* an action of debt, *United States* v. *Michigan* a suit for an accounting, and that which was sought in each was a money judgment against the defendant State.

But we are confronted with the contention that there is no power in this court to enforce such a judgment, and such lack of power is conclusive evidence that, notwithstanding the general language of the Constitution, there is an implied exception of actions brought to recover money. The public property held by any municipality, city, county or State is exempt from seizure upon execution because it is held by such corporation, not as a part of its private assets, but as a trustee for public purposes. *Meriwether* v. *Garrett*, 102 U. S. 472, 513.

As a rule no such municipality has any private property subject to be taken upon execution. A levy of taxes is not within the scope of the judicial power except as it commands an inferior municipality to execute the power granted by the legislature.

In *Rees* v. *City of Watertown*, 19 Wall. 107, 116, 117, we said :

" We are of the opinion that this court has not the power to direct a tax to be levied for the payment of these judgments. This power to impose burdens and raise money is the highest attribute of sovereignty, and is exercised, first, to raise money for public purposes only ; and, second, by the power of legislative authority only. It is a power that has not been extended to the judiciary. Especially is it beyond the power of the Federal judiciary to assume the place of a State in the exercise of this authority at once so delicate and so important."

See also *Heine* v. *The Levee Commissioners*, 19 Wall. 655, 661; *Meriwether* v. *Garrett, supra.*

In this connection reference may be made to *United States* v. *Guthrie*, 17 How. 284, in which an application was made for a mandamus against the Secretary of the Treasury to compel the payment of an official salary, and in which we said (p. 303):

" The only legitimate inquiry for our determination upon the case before us is this : Whether, under the organization of the Federal government or by any known principle of law, there can be asserted a power in the Circuit Court of the United States for the District of Columbia, or in this court, to command the withdrawal of a sum or sums of money from the Treasury of the United States, to be applied in satisfaction of disputed or controverted claims against the United States? This is the question, the very question presented for our determination ; and its simple statement would seem to carry with it the most startling considerations—nay, its unavoidable negation, unless this should be prevented by some positive and controlling command ; for it would occur, *a priori*, to every mind, that a treasury, not fenced round or shielded by fixed and established modes and rules of administration, but which

could be subjected to any number or description of demands, asserted and sustained through the undefined and undefinable discretion of the courts, would constitute a feeble and inadequate provision for the great and inevitable necessities of the nation. The government under such a *regime*, or, rather, under such an absence of all rule, would, if practicable at all, be administered, not by the great departments ordained by the Constitution and laws, and guided by the modes therein prescribed, but by the uncertain and perhaps contradictory action of the courts, in the enforcement of their views of private interests."

Further, in this connection may be noticed *Gordon* v. *United States*, 117 U. S. 697, in which this court declined to take jurisdiction of an appeal from the Court of Claims, under the statute as it stood at the time of the decision, on the ground that there was not vested by the act of Congress power to enforce its judgment. We quote the following from the opinion, which was the last prepared by Chief Justice Taney (pp. 702, 704):

"The award of execution is a part, and an essential part of every judgment passed by a court exercising judicial power. It is no judgment, in the legal sense of the term, without it. Without such an award the judgment would be inoperative and nugatory, leaving the aggrieved party without a remedy. . . . Indeed, no principle of constitutional law has been more firmly established or constantly adhered to, than the one above stated—that is, that this court has no jurisdiction in any case where it cannot render judgment in the legal sense of the term; and when it depends upon the legislature to carry its opinion into effect or not, at the pleasure of Congress." See also *In re Sanborn,* 148 U. S. 222, and *La Abra Silver Mining Company* v. *United States,* 175 U. S. 423, 456.

We have, then, on the one hand the general language of the Constitution vesting jurisdiction in this court over "controversies between two or more States," the history of that jurisdictional clause in the convention, the cases of *Chisholm* v. *Georgia, United States* v. *North Carolina* and *United States* v. *Michigan,* (in which this court sustained jurisdiction over actions

to recover money from a State;) the manifest trend of other decisions, the necessity of some way of ending controversies between States, and the fact that this claim for the payment of money is one justiciable in its nature; on the other, certain expression of individual opinions of justices of this court, the difficulty of enforcing a judgment for money against a State, by reason of its ordinary lack of private property subject to seizure upon execution, and the absolute inability of a court to compel a levy of taxes by the legislature. Notwithstanding the embarrassments which surround the question it is directly presented and may have to be determined before the case is finally concluded, but for the present it is sufficient to state the question with its difficulties.

There is in this case a mortgage of property, and the sale of that property under a foreclosure may satisfy the plaintiff's claim. If that should be the result there would be no necessity for a personal judgment against the State. That the State is a necessary party to the foreclosure of the mortgage was settled by *Christian* v. *Atlantic & North Carolina Railroad Company*, 133 U. S. 233. Equity is satisfied by a decree for a foreclosure and sale of the mortgaged property, leaving the question of a judgment over for any deficiency, to be determined when, if ever, it arises. And surely if, as we have often held, this court has jurisdiction of an action by one State against another to recover a tract of land, there would seem to be no doubt of the jurisdiction of one to enforce the delivery of personal property.

A decree will, therefore, be entered, which, after finding the amount due on the bonds and coupons in suit to be twenty-seven thousand four hundred dollars ($27,400), (no interest being recoverable, *United States* v. *North Carolina*, 136 U. S. 211), and that the same are secured by one hundred shares of the stock of the North Carolina Railroad Company, belonging to the State of North Carolina, shall order that the said State of North Carolina pay said amount with costs of suit to the State of South Dakota on or before the 1st Monday of January, 1905, and that in default of such payment an order of sale be issued to the Marshal of this court, directing him to sell

at public auction all the interest of the State of North Carolina
in and to one hundred shares of the capital stock of the North
Carolina Railroad Company, such sale to be made at the east
front door of the Capitol Building in this city, public notice
to be given of such sale by advertisements once a week for six
weeks in some daily paper published in the city of Raleigh,
North Carolina, and also in some daily paper published in the
city of Washington.

And either of the parties to this suit may apply to the court
upon the foot of this decree, as occasion may require.

MR. JUSTICE WHITE, with whom concurred MR. CHIEF JUS-
TICE FULLER, MR. JUSTICE McKENNA and MR. JUSTICE DAY,
dissenting.

The decision in this case seems to me to disregard an ex-
press and absolute prohibition of the Constitution.   The facts
are stated in the opinion of the court.   As, however, there
are some facts deemed by me to be material, which are not
referred to, it is proposed to make a summary of the case,
and then express the reasons which control me.

In the years 1847 and 1855 the negotiable bonds of the State
of North Carolina were issued to aid in the construction of
the railway of the North Carolina Railroad Company and
were exchanged for the stock of that company.   The bonds
went into the hands of individuals and the exchanged stock
passed into the possession of the State, and was declared to
be pledged in the hands of the State to secure the payment of
the bonds in question.

In 1855 and 1866 similar aid was given to another railway,
the Western North Carolina.   Bonds, each for the par value
of one thousand dollars, aggregating nearly two and a half
millions of dollars, were issued by the State.   All the bonds,
which were issued after the passage, in 1866, of an act of the
legislature, were declared to be secured, as stated in the act,
by a mortgage of the stock of the North Carolina Railroad
held by the State and already, in its entirety, pledged for the
security of all the bonds which had been previously issued

in aid of the North Carolina Railroad. The stock, how-
ever, remained in possession of the State, but each of the
bonds thereafter issued contained an endorsement that ten
shares of stock of the North Carolina Railroad Company in
the hands of the State were mortgaged as security for the pay-
ment of each of the bonds.

Presumably, as a result of the disastrous consequences of
the civil war and the events which followed, the financial
affairs of the State of North Carolina in 1879 were profoundly
embarrassed. The State had not paid the interest as it accrued
on the bonds issued in aid of the North Carolina Railroad.
It had in effect paid no interest whatever on the bonds issued
in favor of the Western North Carolina Railroad, and, indeed,
had defaulted generally in the payment of the interest on its
public debt. Statutes were passed by the State providing for
an adjustment of its financial affairs, so as to rehabilitate its
credit, in order that when the state debt was readjusted the
State might, for the benefit of all its people and its creditors,
be able to pay the interest on and provide for the principal of
the public debt. The adjustment made was accepted by those
holding the bonds issued in aid of the North Carolina Rail-
road and they waived a very large sum of unpaid interest and
received new bonds, accompanied with a reiteration of the
pledge of all the stock of the North Carolina Railroad owned
by the State, which had always been held by the State as
security for the payment of all the bonds of that issue. It is
to be inferred from the record that the adjustment proposed
was generally accepted by the other creditors of the State,
and that as a consequence its fiscal affairs were placed upon a
sound basis. Be this as it may, certain is it that the adjust-
ment was accepted by the holders of a vast majority of the
bonds issued in aid of the Western North Carolina Railroad,
and that such holders surrendered their old bonds and took
new bonds of the State for twenty-five per cent of the face
value of their bonds, these new bonds not purporting to be
secured by any mortgage of the stock of the North Carolina
Railroad.

In 1901, twenty-two years after the passage of the acts re-

ferred to, and their acceptance as above stated, Simon Schafer
and his brother, composing the firm of Schafer & Brothers,
bankers and brokers in the city of New York, addressed a
petition to the legislature of North Carolina.    Therein it was
recited that the parties named were the holders, in their own
right and as trustees, of nearly two hundred and fifty thousand
dollars of the bonds issued in aid of the Western North
Carolina Railroad Company, attached to which were unpaid
interest coupons for more than thirty years.    The petitioners
declared that these bonds were substantially all the bonds of
the series then outstanding because the holders thereof had
not accepted the arrangement of 1879.    It was stated that
such arrangements had been accepted by the vast majority of
others who held such bonds by reason of the financial stress
of the State at the time, and because those creditors knew that
the stock of the North Carolina Railroad mortgaged to secure
the bonds was of no avail for such purpose, since its value at
the time of the adjustment was not adequate to pay the bonds
issued in aid of the North Carolina Railroad, in favor of which
it was first pledged.    It was recited that the petitioners had
not availed of the adjustment because they preferred waiting
a restoration of the credit of the State, and trusted that the
stock of the North Carolina Railroad might ultimately prove
adequate to pay the bonds as reduced, issued in favor of the
North Carolina Railroad, and the small amount of bonds which
remained outstanding, as a result of the adjustment.    It was
declared that this had been accomplished; that in consequence
of the reduced amount of the North Carolina Railroad bonds
brought about by the adjustment, and the retirement thereby
effected of all the bonds of the Western North Carolina Rail-
road except the small amount held or represented by the
petitioners, the stock of the North Carolina Railroad held by
the State, if sold, would be adequate to pay both series and
leave a balance in favor of the State.    Reciting that the peti-
tioners and those they represented were aware that their
claims against the State could not be judicially enforced
either in the state or Federal courts, the prayer was that an
appropriation might be made to pay their bonds in principal

and accumulated interest, or that in default an act be passed authorizing suit in the courts to enforce the mortgage lien asserted to exist on the stock of the North Carolina Railroad. The prayer of this petition was not granted.

Shortly following the failure to act favorably upon the petition just referred to, the act of the legislature of South Dakota, set out in the opinion of the court, was passed. It will be observed that, among other things, it empowered the governor to accept gifts made to the State of bonds or choses in action, and authorized the attorney general of the State, when such gifts were accepted, to bring suit in the name of the State to enforce payment of the same, and for that purpose " to employ counsel to be associated with him in such suits or actions, who, with him, shall fully represent the State, and shall be entitled to reasonable compensation (italics mine) *out of the recoveries and collections in such suits and actions.*" Thereupon Simon Schafer addressed the letter to the Hon. Charles H. Burke, a member of Congress from South Dakota, which is reproduced in full in the opinion of the court. It suffices to say that by that letter ten of the bonds were given to the State of South Dakota, and it was especially mentioned that the gift was made because Schafer was aware that he could not sue the State of North Carolina, whilst the State of South Dakota could do so. The letter also contained the suggestion, presumably as an inducement to an acceptance by the State, that if the ten bonds were enforced by the State of South Dakota, other gifts of similar bonds might be made. The bonds were accepted by the governor of South Dakota, and the attorney general of that State thereupon filed the present bill. The parties defendant were the State of North Carolina, a person sued as representing all the holders of bonds issued in aid of the North Carolina Railroad and a person sued as representative of the holders of the outstanding bonds issued in aid of the Western North Carolina Railroad. The prayer of the bill was in substance for a decree against the State of North Carolina for the amount of the principal of the bonds and for more than thirty years' accrued interest; for an enforcement of the mortgage asserted to exist on the stock of

the North Carolina Railroad Company held by the State; for a decree declaring that the holders of the bonds issued in favor of the North Carolina Railroad Company had lost their prior lien upon the whole stock by reason of their acceptance of the compromise under the act of 1879, and the taking of new bonds by them in pursuance thereof. It was, however, prayed that in the event it should be found that the lien of such bondholders on the stock had not been waived, the stock be ordered sold free from all encumbrances to satisfy the claims of the respective lienholders thereon, and that distribution be made of the proceeds of the stock among them according to priority.

The State answered, challenging the jurisdiction of this court to entertain the bill, and also urging various defences on the merits.

The person joined as representing the bonds issued in aid of the North Carolina Railroad made no appearance. Charles Salter, who was made defendant as representative of the holders of the bonds issued in aid of the Western North Carolina Railroad, answered, substantially admitting all the allegations of the bill, but praying "that plaintiff's bill be dismissed with costs, unless the court shall decree that all the stock subject to the second mortgage be sold for the benefit of all the holders of said second mortgage bonds."

The court now decides that it has jurisdiction, because of the delegation, in the second section of the third article of the Constitution, of judicial power to the United States over "controversies between two or more States," and because of the grant to this court of original jurisdiction over cases in which a State shall be a party. Whilst conceding that if the holders of the bonds issued in aid of the North Carolina Railroad are necessary parties the jurisdiction would be ousted, it is held that such bondholders are not necessary parties, since there may be a sale to enforce complainant's rights of a portion of the stock held by the State of North Carolina, subject to the prior rights therein of the holders of such bonds. The decree which will be entered will therefore, adjudge the State of North Carolina to be indebted to South Dakota in the

amount of the principal of the ten bonds, with more than thirty years' accrued interest. The decree will direct the sale of the stock in the North Carolina Railroad Company held by the State, subject to the prior pledge in favor of the holders of the bonds of the North Carolina Railroad. The question of a deficiency decree is reserved, in case, as a result of the sale, the debt decreed against the State should not be extinguished.

With this summary of the pleadings, the facts, and the decision of the court in mind, I shall now state the reasons which compel me to dissent, all of which may be embraced in the two following general propositions which I shall examine under separate headings : (A) The absolute want of power in the court to render a decree between the two States on the cause of action sued on; and (B) The want of power to render the decree which is now directed to be entered, because of the absence of essential parties whose presence would oust jurisdiction and the impotency to grant any relief whatever in the absence of such parties.

## (A.)

*The absolute want of power in the court to render a decree between the two States on the cause of action sued on.*

*First.* The power of this court to award a decree against the State of North Carolina is based on the provision in the second section of the third article of the Constitution, extending the judicial power of the United States over " controversies between two or more States," and to the delegation to this court of original jurisdiction over such controversies. If the provisions in question were the only ones on the subject it might be more difficult to deny that the Federal judicial power embraced this controversy. Those provisions, however, do not stand alone, since they must be considered in connection with the Eleventh Amendment to the Constitution, providing that " the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign state."

The question which the case involves is not what in a generic sense may be considered a controversy between States, but whether the particular claim here asserted by the State of South Dakota is in any view such a controversy. It is also to be observed that the question is not whether a controversy between States may not rise from a debt originating as the result of a direct transaction between States, but is whether one State can acquire a claim asserted against another State by a citizen of that or of another State or an alien, and as a result sue upon it, and thereby create a controversy between States in a constitutional sense. Indeed, the question is narrower than this, since in this case the alleged debtor State had years before the transfer of the claim in question, while it was yet owned by individuals, declined to recognize the debt, and had refused payment thereof, as the result of a controversy between itself and its alleged creditors.

I take it to be an elementary rule of constitutional construction that no one provision of the Constitution is to be segregated from all the others, and to be considered alone, but that all the provisions bearing upon a particular subject are to be brought into view and to be so interpreted as to effectuate the great purposes of the instrument. If, in following this rule, it be found that an asserted construction of any one provision of the Constitution would, if adopted, neutralize a positive prohibition of another provision of that instrument, then it results that such asserted construction is erroneous, since its enforcement would mean, not to give effect to the Constitution, but to destroy a portion thereof. My mind cannot escape the conclusion that if, wherever an individual has a claim, whether in contract or tort, against a State, he may, by transferring it to another State, bring into play the judicial power of the United States to enforce such claim, then the prohibition contained in the Eleventh Amendment is a mere letter, without spirit and without force. This is said because no escape is seen from the conclusion if the application of the prohibition is to depend solely upon the willingness of the creditor of a State, whether citizen or alien, to transfer, and the docility or cupidity of another State in accepting such transfer, that the

provision will have no efficacy whatever. And this becomes doubly cogent when the history of the Eleventh Amendment is considered and the purpose of its adoption is borne in mind.

It is familiar that the amendment was adopted because of the decision of this court in 1793, in *Chisholm* v. *Georgia*, 2 Dall. 419, holding that the grant of judicial power to the United States to determine controversies between a State and a citizen of another State vested authority to determine a controversy wherein a citizen of a State asserted a claim against another State. That the purpose of the amendment was to remove the possibility of the assertion of such a claim is aptly shown by the passage from the opinion of Mr. Chief Justice Marshall in *Cohens* v. *Virginia*, 6 Wheat. 264, as quoted in the opinion of the court in this case, saying (p. 406):

" It is a part of our history, that, at the adoption of the Constitution, all the States were greatly indebted; and the apprehension that these debts might be prosecuted in the Federal courts, formed a very serious objection to that instrument. Suits were instituted; and the court maintained its jurisdiction. The alarm was general; and, to quiet the apprehensions that were so extensively entertained, this amendment was proposed in Congress, and adopted by the state legislatures." ·

As the purpose of the amendment was to prohibit the enforcement of individual claims against the several States by means of the judicial power of the United States, and as the amendment was subsequent to the grant of judicial power made by the Constitution, the amendment qualified the whole grant of judicial power to the extent necessary to render it impossible by indirection to escape the operation of the avowed purpose which the people of the United States expressed in adopting the amendment. How, as declared by Chief Justice Marshall, could the adoption of the amendment have quieted the apprehensions concerning the right to enforce private claims against the States, if the power was left open after the amendment to do so, if only they were transferred to another State? It is also to be observed that the construction now given causes the judicial power of the United States to embrace

claims not within even the reach of the ruling in *Chisholm* v. *Georgia*, for that case only decided that under the grant of power a citizen of one State might sue another State. But under the rule of construction, now announced, not only claims held by citizens of other States and aliens, but those held by a citizen of the State, become capable of enforcement, if only the holders of such claims, after the State has refused to pay them, choose to sell or make gift thereof to another State found willing to become a party to a plan to evade a constitutional provision inserted for the protection of all the States.

Let me, *arguendo*, grant that a case may be conceived of where one provision of the Constitution can be so construed as to render nugatory another and applicable provision. Even such an impossible doctrine can have no relation to the case in hand. The decisions of this court, rendered since the Eleventh Amendment, have consistently held that that amendment embodied a principle of national public policy, whose enforcement may not be avoided by indirection or subterfuge. Ought this rule of public policy to be disregarded, by endowing every State with the power of speculating upon stale and unenforceable claims of individuals against other States, thus not only doing injustice, but also overthrowing the fiscal independence of every State, and destroying that harmony between them which it was the declared purpose of the Constitution to establish and cement? Such a departure from the provisions of the Eleventh Amendment, and the rule of national public policy which it embodies, may not be sustained by the assumption that it would be unduly curtailing the independence of the several States to deny them the right of enforcing, by the aid of the Federal judicial power, claims against other States acquired from private individuals. For this assumption would amount to this, that any and all of the States only enjoy the essential privilege of being free from coercion as to the claims of individuals, and have the power to manage their financial affairs at the mere pleasure of any of the other States. This is to say, that for the purpose of preserving the rights of the States, those rights must be destroyed.

It is true that the greater number of cases decided by this

court concerning the right to enforce a private claim against a
State concerned controversies where suit was brought by citizens of other States or aliens, who were therefore persons expressly within the terms of the Eleventh Amendment. An
analysis of those cases, however, will show that they were decided, not upon the mere ground that the person who sued was
within the Eleventh Amendment, but upon the broad proposition that, by the effect of that amendment, claims of private
individuals could not be enforced against a State, and that in
upholding this constitutional limitation the court would look
at the real nature of the controversy, irrespective of the parties
on the record. If it were found by doing so that in effect the
consequence of the granting of the relief would be to enforce
by the Federal judicial power the claim of a private individual against a State, such relief would be denied. I content
myself with the reference in the margin to the leading cases
of this character,[1] and come at once to consider the adjudications of this court rendered in two cases which directly related
to the operation of the prohibitions of the Eleventh Amendment on the grant of judicial power to the United States over
controversies between States, and to two other cases which directly concerned the effect of the prohibitions of the Eleventh
Amendment in suits brought by persons who were within the
grant of the judicial power but were not embraced within the
category of persons specifically referred to in the Eleventh
Amendment. The first two cases referred to are *New Hampshire* v. *Louisiana* and *New York* v. *Louisiana*. The opinion

---

[1] *Hollingsworth* v. *Virginia*, (1798) 3 Dall. 378; *Osborn* v. *Bank*, (1824)
9 Wheat. 738, 849; *Briscoe* v. *Bank*, (1837) 11 Pet. 257, 321; *Louisiana* v.
*Jumel*, (1883) 107 U. S. 711; *Poindexter* v. *Greenhow*, (1885) 114 U. S. 270,
286; *Marye* v. *Parsons*, (1885) 114 U. S. 325; *Hagood* v. *Southern*, (1886)
117 U. S. 52; *In re Ayers*, (1887) 123 U. S. 443, 504; *Christian* v. *Atlantic
& N. C. R. R. Co.*, (1890) 133 U. S. 233, 243; *Louisiana ex rel. N. Y. Guaranty & Indemnity Co.* v. *Steele*, (1890) 134 U. S. 230; *Pennoyer* v. *McConnaughy*, (1891) 140 U. S. 1; *In re Tyler*, (1893) 149 U. S. 164, 190; *Reagan*
v. *Farmers' Loan & Trust Co.*, (1894) 154 U. S. 362, 388; *Scott* v. *Donald*,
(1897) 165 U. S. 58; *Tindal* v. *Wesley*, (1897) 167 U. S. 204, 219; *Smyth* v.
*Ames*, (1898) 169 U. S. 466, 518; *Fitts* v. *McGhee*, (1899) 172 U. S. 516, 524.

of the court in both was delivered by Mr. Chief Justice Waite, and is reported (1883) in 108 U. S. 76. The suits were orig-. inally brought in this court. The complainants were, in the one case, the State of New Hampshire, and in the other the State of New York; the principal defendant in both cases being the State of Louisiana. The complainant States asserted the right to enforce certain pecuniary claims against the State of Louisiana, as the holders of the naked legal title to certain coupons and bonds of the State of Louisiana, which, pursuant to legislative authority, by assignment, had been acquired from citizens of the respective States, for the purpose of collection for the benefit of such citizens. The defendant State challenged the jurisdiction of this court over the controversy. To sustain such jurisdiction it was pressed by the complainant that the bonds and coupons were negotiable instruments, of which the assignee States became the legal owners, and that as such they as a matter of law were the real parties in interest, whether the transfer was a complete sale or merely made for the purpose of collection for the benefit of the assignors. The court first considered the grant of judicial power to the United States prior to the adoption of the Eleventh Amendment and held that as such power, when originally conferred, as interpreted in *Chisholm* v. *Georgia*, embraced the right of a citizen of one State to enforce his claims by suit directly against another State, a State could not, as the holder of the legal title, champion for its citizens a right for the prosecution of which a particular remedy had been provided by the Constitution. Coming to generally consider the effect of the Eleventh Amendment as elucidated by the history connected with its adoption, it was decided that as that amendment had expressly taken away the right of a citizen of one State to sue another State, a State could not enforce a right the assertion of which in the courts was prohibited to the citizen himself. Noticing the contention that the grant of judicial power over controversies between States was but a substitute for the surrender to the national government which each State had made, of the power of prosecuting against another State, by force if necessary as a sovereign trustee for its citizens, the claims of such citizens, the

proposition was held not to be sustainable, under the Constitution of the United States.  It was decided that the special remedy originally granted to the citizen himself "must be deemed to have been the only remedy the citizen of one State could have under the Constitution against another State for the redress of his grievances, except such as the delinquent State saw fit itself to grant."  Having announced this doctrine, it was then, as an inevitable deduction from it decided that, as the Eleventh Amendment had taken away the special remedy originally provided by the Constitution, there was no other remedy whatever left.·  The opinion of the court concluded as follows (p. 91):

"The evident purpose of the amendment, so promptly proposed and finally adopted, was to prohibit all suits against a State by or for citizens of other States, or aliens, without the consent of the State to be sued and, in our opinion, one State cannot create a controversy with another State, within the meaning of that term as used in the judicial clauses of the Constitution, by assuming the prosecution of debts owing by the other State to its citizens.  Such being the case we are satisfied that we are prohibited, both by the letter and the spirit of the Constitution, from entertaining these suits, and the bill in each case is dismissed."

To me it seems that this adjudication is conclusive of the question now here.  It in the broadest way determined that the prohibitions of the Eleventh Amendment controlled the grant of judicial power as to controversies between the States so as to exclude the possibility of that grant vesting a State with·authority in any form, directly or indirectly, to set at naught the Eleventh Amendment.  The case was decided, not upon the particular nature of the title of the bonds and coupons asserted by the States of New Hampshire and New York, since it was conceded that, but for the Constitution, a title such as that propounded would have given rise to an adequate cause of action.  The ruling of the court was that, as suits against a State upon the claims of private individuals were absolutely prohibited by the Eleventh Amendment, such character of claim could not be converted into a controversy be-

334                OCTOBER TERM, 1903.

White, J., The Chief Justice, McKenna, Day, JJ., dissenting.    192 U. S.

tween States, and thus be made justiciable, since to do so would destroy the prohibition which the Eleventh Amendment embodied. I do not perceive, if one State may not engender a controversy between States, in the constitutional sense, in respect to claims arising out of dealings between a State and individuals, how it was competent for the State of South Dakota to create such a controversy by the acquisition of a claim of the class whose enforcement it was the purpose of the Eleventh Amendment to effectually prohibit. It is to be observed that in the cases referred to the court did not deny that a sovereign State, in virtue of its existence as such, would not have possessed the inherent power to prosecute against another State the claims of its citizens, and that such a prosecution by it would have constituted a controversy between States in the international significance of those words. But the court held that controversies between States, in the constitutional sense, did not embrace rights of that character, because of the prohibitions of the Eleventh Amendment, which operated upon the whole grant of judicial power, including, of course, such grant as to controversies between States.

The two other cases to which I have referred are *Hans* v. *Louisiana,* (1890) 134 U. S. 1, and *Smith* v. *Reeves,* (1900) 178 U. S. 436. In the first, the opinion of the court was delivered by Mr. Justice Bradley; in the second, by Mr. Justice Harlan. In *Hans* v. *Louisiana,* a suit was brought in the Circuit Court of the United States against the State of Louisiana by a citizen of that State, under the claim that the rights asserted arose under the Constitution and laws of the United States, and therefore were not within the Eleventh Amendment, since that amendment only prohibited suits against a State by a citizen of another State or by aliens. The argument was pressed that as the guarantees of the Constitution were all-abiding, it would be against public policy to deprive a citizen of the protection of the Constitution of the United States by bringing him within the spirit when he was not within the letter of the Eleventh Amendment. The court answered the contention in the broadest possible way. It held that the effect of the Eleventh Amendment was to qualify

to the extent of its prohibitions, the whole grant of judicial power, and, therefore, although a suit by a citizen of a State against a State to enforce assumed constitutional rights, was not within the letter of the amendment, it was within its spirit, and there was no jurisdiction in the Federal courts over such controversy. In summing up its general conclusions the court said (p. 21):

" It is not necessary that we should enter upon an examination of the reason or expediency of the rule which exempts a sovereign State from prosecution in a court of justice at the suit of individuals. This is fully discussed by writers on public law. It is enough for us to declare its existence. The legislative department of a State represents its polity and its will; and is called upon by the highest demands of natural and political law to preserve justice and judgments, and to hold inviolate the public obligations. Any departure from this rule, except for reasons most cogent, (of which the legislature, and not the courts, is the judge,) never fails in the end to incur the odium of the world, and to bring lasting injury upon the State itself. But to deprive the legislature of the power of judging what the honor and safety of the State may require, even at the expense of a temporary failure to discharge the public debts, would be attended with greater evils than such failure can cause."

*Smith* v. *Reeves* was an action brought in the Circuit Court of the United States by a corporation created under an act of Congress, against the treasurer of the State of California, to obtain redress concerning certain taxes. The defendant challenged the jurisdiction upon the ground that in effect the action was one against a State. This court, concluding that the State of California was the real party in interest, was led to consider whether a Federal court was thereby deprived of jurisdiction. The contention on the part of the plaintiff was that as a Federal corporation had a right to invoke, in virtue of the law of its creation, the jurisdiction of the Federal courts, the case was not controlled by the prohibitions of the Eleventh Amendment forbidding suits against a State by citizens of other States or aliens. The court, speaking through Mr. Jus-

tice Harlan, again adversely disposed of the contention, saying (p. 446):

"If the Constitution be so interpreted it would follow that any corporation created by Congress may sue a State in a Circuit Court of the United States upon any cause of action, whatever its nature, if the value of the matter in dispute is sufficient to give jurisdiction. We cannot approve this interpretation."

After referring to the views expressed by Hamilton, Madison and Marshall, which were commented upon in *Hans* v. *Louisiana*, the court quoted approvingly the following passage from the opinion in *Hans* v. *Louisiana*:

"It seems to us that these views of those great advocates and defenders of the Constitution were most sensible and just; and they apply equally to the present case as to that then under discussion. The letter is appealed to now, as it was then, as a ground for sustaining a suit brought by an individual against a State. The reason against it is as strong in this case as it was in that. It is an attempt to strain the Constitution and the law to a construction never imagined or dreamed of. Can we suppose that, when the Eleventh Amendment was adopted, it was understood to be left open for citizens of a State to sue their own State in the Federal courts, whilst the idea of suits by citizens of other States, or of foreign States, was indignantly repelled? Suppose that Congress, when proposing the Eleventh Amendment, had appended to it a proviso that nothing therein contained should prevent a State from being sued by its own citizens in cases arising under the Constitution or laws of the United States, can we imagine that it would have been adopted by the States? The supposition that it would is almost an absurdity on its face."

The opinion concluded as follows (p. 449):

"It could never have been intended to exclude from Federal judicial power suits arising under the Constitution or laws of the United States when brought against a State by private individuals or state corporations, and at the same time extend such power to suits of like character brought by Federal corporations against a State without its consent."

Here again I am unable to perceive any ground for taking the case in hand out of the rulings made in the cases just reviewed. The letter of the Eleventh Amendment was just as inapplicable to a suit by a citizen of a State against a State to enforce his constitutional rights and to a suit by a Federal corporation, suing in the Federal court by virtue of its creation, as it was to the grant of judicial power over controversies between States. But the prohibition of the Eleventh Amendment was held to apply, because that amendment was again construed as prohibiting the enforcement of claims by private individuals against States through the judicial power of the United States, without reference to the character of the person by whom the claim was asserted. In other words, the decision was that the operation of the Eleventh Amendment was to be determined, not by the formal party complainant on the record, but by the essential character and nature of the claim or right which was asserted. This being the decision, how consistently can the State of South Dakota be held to have power to give effect to a character of claim as to which the Eleventh Amendment declares the judicial power of the United States shall not extend.

Will not the accuracy of what I have just stated, as applied to this case, be demonstrated by putting the question which this court put in *Hans* v. *Louisiana* and approvingly reiterated in *Smith* v. *Reeves,* and giving it the answer which the court gave in those cases, changing, of course, the form of the question to meet the case now here. For this purpose, I repeat the question, placing, however, in brackets the changed mode of expression necessitated by the difference in the character of the parties complainant. "Suppose that Congress, when proposing the Eleventh Amendment, had appended to it a proviso that nothing therein contained should prevent a State from being sued" [upon private claims due to its own citizens or to aliens or citizens of other States, if only such claims were sold or otherwise disposed of long after the debtor State had refused to pay them, so as to thus secure their judicial enforcement] "can we imagine that the Eleventh Amendment would have been adopted by the States? The supposition that it would is almost an absurdity on its face."

Nor do I think the previous decisions of this court, which are relied upon as establishing that the State of South Dakota may maintain this suit, have any such tendency. Of course, it is not by me denied that a dispute as to boundaries between two States is judicially cognizable as a controversy between States, and that such may also be the case where one State asserts property rights against another, provided always that the assertion of the particular right does not violate the prohibitions of the Eleventh Amendment. So, also, in my opinion, *United States* v. *North Carolina*, 136 U. S. 211, and *United States* v. *Texas*, 143 U. S. 621, instead of sustaining the view that the cause of action here asserted can be treated, despite the provisions of the Eleventh Amendment, as a controversy between States, establish the contrary. In *United States* v. *North Carolina*, the United States sued the State of North Carolina concerning the interest on certain bonds. No objection was taken by North Carolina to the jurisdiction of the court, since that State voluntarily assented to a judicial determination of the issue involved. There was, and could have been, therefore, no question of jurisdiction, so far as the State of North Carolina was concerned. The only question of jurisdiction which could have arisen was whether a suit by the United States against a State was within the constitutional grant of judicial power. Although the court in its opinion in *United States* v. *North Carolina* did not refer to the subject of jurisdiction, it must be assumed that it was considered. This is shown by a remark concerning *United States* v. *North Carolina*, made by the court in the course of its opinion in *United States* v. *Texas*, to the following effect:

" It is true that no question was made as to the jurisdiction of this court, and nothing was therefore said in the opinion upon that subject. But it did not escape the attention of the court, and the judgment would not have been rendered except upon the theory that this court has original jurisdiction of a suit by the United States against the State."

Those two cases, therefore, so far as jurisdiction is concerned, simply determined that the grant of judicial power concerning controversies between States, whilst not in letter, embrac-

ing a suit brought by the United States against a State, in spirit and purpose did give jurisdiction of a suit of that character.   The effect of these rulings, then, was but to cause a suit by the United States against a State to be within the meaning of controversies between States.   In other words, in ascertaining the import of the grant of judicial power as to controversies between States, the court gave force to the spirit and purpose of the Constitution in order to include a suit by the United States against a State within the category of controversies between States.   This was simply applying the same rule of construction to the grant of judicial power for the purpose of including the United States, which had been previously applied in *Hans* v. *Louisiana*, in *Smith* v. *Reeves*, and in all the other cases to which I have referred, in order to exclude jurisdiction over controversies, to entertain which would have been a violation of the spirit and purpose of the Eleventh Amendment.   When *United States* v. *North Carolina* and *United States* v. *Texas* are considered, it seems to me clear that the decision now made not only is destructive of the inherent rights of the States as protected by the Eleventh Amendment, but also strips the government of the United States of its rights as a sovereign belonging to it under the Constitution.   As under the decisions referred to a suit between the United States and a State is within the grant of judicial power over controversies between States, it must follow that a suit by a State against the United States is also of that character.   Now, as the ruling is that such a controversy may include the claim of a private individual, if only such claim be transferred to a State, it follows that a suit by a State against the United States on a claim of that character is within the grant of judicial power.   Thus it has come to pass that any and every claim against the United States, whatever be its character, is enforceable against the United States if only a State chooses to acquire and prosecute its enforcement.   It is no answer to suggest that such claims of private individuals are not justiciable unless the law of the United States has caused them to be so, for if the constitutional grant of judicial power embraces such contro-

versies as is now necessarily held, any restriction by Congress would be repugnant to the Constitution.

My reason does not perceive how the principles which have been stated and the rulings of this court enforcing them are rendered inapplicable by the suggestion that, as the court may not inquire into the motives actuating a particular transfer of right, therefore it is without power to refuse to enforce in behalf of South Dakota the alleged gift.  This proceeds upon the assumption that the want of jurisdiction to enforce a private claim against a State depends upon motive.  But the absence of such jurisdiction rests upon the constitutional prohibition which addresses itself to the very nature of the cause of action and imposes upon the court the duty to inquire into it.  The power of the court when such is the case, even in a case brought in this court by one of the States of the Union to enforce an alleged pecuniary right, is aptly illustrated by *Wisconsin* v. *Pelican Insurance Co.*, 127 U. S. 265.  There the State of Wisconsin, having obtained a judgment against the defendant corporation in the courts of Wisconsin, availed of the original jurisdiction of this court to sue the defendant corporation to enforce the judgment.  It was held that, as the judgment was for a penalty imposed by the laws of Wisconsin, and as penalties had no extraterritorial operation, the court would look at the origin of the rights upon which the judgment was based, and, doing so, declined to enforce the judgment.  See also *Andrews* v. *Andrews*, 188 U. S. 14.  If, as the result of merely a general rule of law against the extraterritorial operation of statutory penalties, this court looked beyond the judgment sued on by a State to the cause of action merged in the judgment, and refused relief, the court now must have the power to look into the present cause of action and the origin of the rights asserted by the State of South Dakota.  To do otherwise seems to me is but to declare that a general principle of law restricting the extraterritorial enforcement of penal statutes must be held to have more sanctity than the declared will of the people of the United States expressed in the Eleventh Amendment.  Indeed, the existence of power in this court to inquire into purpose and motive in suits brought by one

State against another State was directly upheld in *New Hampshire* v. *Louisiana* and *New York* v. *Louisiana*, *supra*. It was not denied in those cases that the bonds sued upon were negotiable, and that if the rules of law controlling in controversies between private individuals were to be applied, the title of each plaintiff State to the bonds it sought recovery upon could not be gainsaid, but should be regarded as absolute. Coming, however, to enforce the provisions of the Eleventh Amendment, the court held that it was its duty to depart from the rule ordinarily applied and to examine into the nature of the asserted rights, and if to give effect thereto would be inconsistent with constitutional provisions, to refuse to lend its aid to the enforcement of the claims.

*Second.* But putting out of view what seem to be the controlling principles previously stated, let me now look at the controversy from a narrower point of view and consider the rights of the parties by those considerations which would apply to the enforcement of private rights. It is unquestioned on the record that the bonds given to the State of South Dakota and upon which its action is based were past due at the time of the gift, and that for more than twenty years prior to the gift the State of North Carolina had, by her legislation, held herself not bound to pay the same. That these facts were known to the State of South Dakota when it accepted the gift is shown. The makers of the gift could not transfer to the State of South Dakota rights which they had not. In other words, if when the gift was made that which was parted with was not susceptible and had never been susceptible of legal enforcement because not embodying a justiciable obligation against the State of North Carolina, the State of South Dakota could not, by the acceptance of the gift, acquire greater rights than were possessed by the transferrer. I take it to be the elementary rule of public law that, whilst the contracts of a sovereign may engender natural or moral obligations, and are in one sense property, they are yet obligations resting on the promise of the sovereign and possessing no other sanction than the good faith and honor of the sovereign itself. These principles, as applied to the States of

this Union, àre the necessary resultant of the adoption of the Eleventh Amendment.  It is not necessary to refer to opinions of publicists on the general subject, since this court—as to the States of the Union—has declared the doctrine so fully as to leave it no longer an open question in this forum.

The concluding passages already quoted from the opinion in *Hans* v. *Louisiana, supra,* approvingly referred to in *Smith* v. *Reeves,* state the subject in the clearest possible way. Prior to the cases just mentioned, however, this court in numerous decisions had announced the same doctrine.  A few of the more important of those cases will now be briefly noticed.  In *In re Ayers,* (1887) 123 U. S. 443, the court, speaking, through Mr. Justice Matthews, said (p. 504):

"It cannot be doubted that the 11th Amendment to the Constitution operates to create an important distinction between contracts of a State with individuals and contracts between individual parties.  In the case of contracts between individuals, the remedies for their enforcement or breach, in existence at the time they were entered into, are a part of the agreement itself, and constitute a substantial part of its obligation.  *Louisiana* v. *New Orleans,* 102 U. S. 203.  That obligation, by virtue of the provision of article I, § 10, of the Constitution of the United States, cannot be impaired by any subsequent state legislation.  Thus, not only the covenants and conditions of the contract are preserved, but also the substance of the original remedies for its enforcement.  It is different with contracts between individuals and a State.  In respect to these, by virtue of the 11th Amendment to the Constitution, there being no remedy by a suit against the State, the contract is substantially without sanction, except that which arises out of the honor and good faith of the State itself, and these are not subject to coercion.  Although the State may, at the inception of the contract, have consented as one of its conditions to subject itself to suit, it may subsequently withdraw that consent and resume its original immunity, without any violation of the obligation of its contract in the constitutional sense.  *Beers* v. *Arkansas,* 20 How. 527; *Railroad Co.* v. *Tennessee,* 101 U. S. 337.  The very

object and purpose of the 11th Amendment were to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties. It was thought to be neither becoming nor convenient that the several States of the Union, invested with that large residuum of sovereignty which had not been delegated to the United States, should be summoned as defendants to answer the complaints of private persons, whether citizens of other States or aliens, or that the course of their public policy and the administration of their public affairs should be subject to and controlled by the mandates of judicial tribunals without their consent, and in favor of individual interests. To secure the manifest purposes of the constitutional exemption guaranteed by the 11th Amendment requires that it should be interpreted, not literally and too narrowly, but fairly, and with such breadth and largeness as effectually to accomplish the substance of its purpose."

There is another and allied reason which seems to me equally decisive against this claim. As will be observed from the passage already quoted from the opinion of this court in *In re Ayers supra*, it was there affirmatively declared that as the obligation of a State rested but on its conceptions of moral duty, the State itself, under the great responsibilities which attach to it as a sovereign, was the ultimate tribunal to whom the creditor agreed at the very inception of the contract to submit his rights. And that where a sovereign State, in the discharge of the public duty thus resting upon it, declared against the payment of an obligation, such conclusion by the sovereign was a determination by the tribunal which had been impliedly agreed on and was binding upon the creditor, and, as a result of the Eleventh Amendment, not susceptible of review or change by the courts of the United States. Applying this doctrine to this case it is apparent that years before the transfer of the bonds to the State of South Dakota, the State of North Carolina had, through its duly constituted authorities, determined that the holder of the bonds in question had not the right now asserted by the State of South Dakota under the transfer from such

creditor.   This after all only serves additionally to demon-
strate the fallacy underlying the assumption that the State of
South Dakota, because it is a State and may avail of the grant
of judicial power over controversies between States, can in do-
ing so escape the prohibition of the Eleventh Amendment,
created for the very purpose of protecting the States and pre-
serving their independent control over their own affairs.   It
seems to me the gross inequality which must arise from disre-
garding the judgment of the tribunal selected by the creditor
is well illustrated by this case.   When the facts which I have
at the outset stated are recalled, it will be observed that there
were about two and a half millions of dollars of outstanding
bonds of the same series as those now owned by the State of
South Dakota, and that that amount was reduced to about
two hundred and fifty thousand dollars of principal, as a con-
sequence of the conclusion of the State of North Carolina
concerning the exigencies of its financial situation.   It is also
certain, when the facts stated in the petition presented to the
legislature of North Carolina by the assignor of the State of
South Dakota are recalled, that but for this vast reduction of
the debt produced by the determination of the State of North
Carolina, the alleged security now sought to be realized upon
by the State of South Dakota would be of no value.   The
moral attitude shown by the record then is this, that the State
of South Dakota, as the mere beneficiary of the bounty of an
individual, seeks to derive all the benefit resulting from the
judgment of the State of North Carolina as to its public debt
and at the same time desires to repudiate that judgment, and
to obtain rights which never would have been within its reach
if the judgment of the State of North Carolina had not been
exercised.   Under these circumstances it to me seems, even if
a court of equity was vested with power to disregard the final
judgment of the tribunal selected at the time the bonds were
issued, such court should not exercise that power in favor of
one standing on the record in the position which the State of
South Dakota here occupies.

Looking at the question from a yet narrower point of view,
the same conclusion seems to me to be impelled.   In *United*

*States* v. *Buford*, (1830) 3 Pet. 11, the question was considered whether a claim acquired by the government of the United States from an individual, which was barred by limitation at the time of its acquisition by the United States, was yet enforceable in the hands of the government.   The court decided that, as against the United States, under such circumstances, despite the general exemption of the government from the operation of such statute, the bar of the statute was operative.   The court said (p. 30):

"It can require no argument to show, that the transfer of any claim to the United States cannot give to it any greater validity than it possessed in the hands of the assignor."

And this principle was applied by the Court of Exchequer in *King* v. *Morrall*, 6 Price, 24, cited approvingly in *United States* v. *Nashville &c. R. Co.*, 118 U. S. 120.   The facts of the case were, in brief, as follows: On a *scire facias* it was sought by the crown to recover from a creditor of a debtor to the crown the amount of a certain bill of exchange.   On demurrer to a plea of the statute of limitations it was contended that the right of the crown was not barred by the statute—by a plea which in point of fact admitted the debt.   The court held otherwise.   Lord Chief Baron Richards observed (p. 28):

"The crown is only entitled to its debtor's right, and cannot create or revive any right in the person of its debtor, if none ever existed, or it has become extinct.   In this case, nothing could have been recovered by the debtor of the crown against this defendant if the statute had been pleaded; I therefore consider that it is also a good bar to the suit of the crown, who stands precisely in the same situation as its debtor, and that this is an honest plea which therefore the law allows. If the crown could thus put its debtor in a better situation than he was in before, by such a proceeding as this, the consequence would be monstrous before the passing of the late statute, and the mischief would have been incalculable."

Wood, Baron, said (p. 29):

"In this case, the claim of the crown is only a derivative right, and it must, therefore, stand in the same situation as its principal."

Garrow, Baron, remarked (p. 31):

" By a process, said, by a fiction, to be for the benefit of the crown, it is attempted to revive the debt, and place the creditor in a better situation than the law permits.   This is too gross an absurdity;  . . . "

These authorities additionally demonstrate that a claim which, when acquired by the State of South Dakota, was without legal sanction, did not by the mere fact of such acquisition become a justiciable, enforceable right.   It may be said that there was no statute of limitations in the State of North Carolina barring the claim.   But this begs the whole question.   It assumes that the State of North Carolina should have indulged in the idle ceremony of passing a special statute of limitations extinguishing, after the lapse of a certain time, a cause of action which had never existed.   The proposition is but a further illustration of the misconception which results from holding that the claim of an individual against a State which is not enforceable can be made such by the voluntary act of transferring.   The very attribute of sovereignty renders it unnecessary for the sovereign to legislate for its own behalf in the passage of statutes of limitations, insolvent and other like laws, as its will, controlled alone by the duty and sense of responsibility which sovereignty must be presumed to engender, determines the question of liability.

But let me analyze the proposition in order to see what it leads to.   What is a statute of limitations?   It is but the action of the State in determining that, after the lapse of a specified time, a claim shall not be legally enforceable.   In this case, from the very inception of the alleged obligation to the time of the transfer to the State of South Dakota, there was no legal cause of action for the enforcement of the claim under the laws of North Carolina, and by the obligation of the Eleventh Amendment no cause of action on the subject could be asserted to exist in any court of the United States.   To hold that there is a right to recover in this case which would not exist if there had been a statute of limitations barring the cause of action, although none had ever arisen, is but to say that the right of the parties is to be determined by words hav-

ing no significance whatever.. The fact that the state of.
North Carolina, in her own courts, was not subject to be co-
erced as to the claim in question, was in effect a state statute
of limitations, since the act of the State in forbidding the arising
of a cause of action is certainly in reason the equivalent of an
act of that State barring a cause of action in a case where one
could exist. It is the non-existence of the cause of action at
the time of the transfer, upon which rests the rule preventing
a sovereign from recovering on a claim which was barred at
the time it acquired it. This is true also of the Eleventh
Amendment. As that amendment from the date of the incep-
tion of the alleged contract prohibited the assertion of any
cause of action concerning the same in the courts of the United
States, the amendment was substantially a national statute of
limitations. Thus operating, it furnishes an effectual barrier,
preventing the State of South Dakota from asserting in the
courts of the United States that it had acquired from its trans-
ferrer a cause of action which the Constitution of the United
States prevented from ever existing so far as the judicial power
of the United States was concerned. .

Nor does the fact that the State of South Dakota alleges
there was a pledge or mortgage of certain stock in the North
Carolina Railroad serve at all to take the case out of the control
of the provisions of the Eleventh Amendment. It is not
pretended that any delivery of stock alleged to have been
pledged was ever made to the bondholders; on the contrary,
it is conceded that the stock in question has always been in
the possession of the State of North Carolina. The right to
enforce the alleged pledge must therefore rest upon the power
to enforce a private claim against the State of North Carolina
and to take from its possession property of which it has ever
had the absolute dominion and control. And this view is to
my mind concluded by the previous rulings of this court, one
of which I shall now particularly notice.

*Christian* v. *Atlantic & North Carolina Railroad*, (1890)
133 U. S. 233, was a bill in equity to reach dividends on the
stock of the railroad company, and apply such dividends to
the payment of bonds issued by the State of North Carolina,

and for a sale of stock owned and held by the State.  It was contended by the defendants that the proceeding was in substance against the State, and therefore within the prohibitions of the Eleventh Amendment.  The correctness of this contention was denied, on the ground that there was a valid contract in favor of the complainant; that by that contract there was a pledge in its favor; and that the object of the suit was not to hold the State of North Carolina or to sue it, but to proceed *in rem* against the stock to enforce the right in and to it resulting from the contract.  The court—not at all disputing that if the premise was correct the legal conclusion based on it was well founded—proceeded to test the accuracy of the premise.  It found that the stock in question had never been actually delivered to the alleged pledgee, but had always remained in the possession of the agents of the State.  Reaching this conclusion, it was held that there was no pledge unless such contract resulted from the declaration of the State that the stock held by it was pledged.  Coming to consider that question, the court, speaking through Mr. Justice Bradley, said (p. 242):

"It was no more of a pledge than is made by a farmer when he pledges his growing crop or his stock of cattle for the payment of a debt, without any delivery thereof.  He does not use the word in its technical, but in its popular sense.  His language may amount to a parol mortgage, if such a mortgage can be created; but that is all.  So in this case, the pledge given by the State in a statute may have amounted to a mortgage, but it could amount to nothing more; and if a mortgage, it did not place the mortgagee in possession, but gave him merely a naked right to have the property appropriated and applied to the payment of his debt.  But how is that right to be asserted?  If the mortgagor be a private person, the mortgagee may cite him into court and have a decree for the foreclosure and sale of the property.  The mortgagor, or his assignee, would be a necessary party in such a proceeding.  Even when absent, beyond the reach of process, he must still be made a party and at least constructively cited by publication or otherwise.  This is established by the authorities before

SOUTH DAKOTA *v.* NORTH CAROLINA.     349

192 U. S.. WHITE, J., The CHIEF JUSTICE, McKENNA, DAY, JJ., dissenting.

referred to, and many more might be cited to the same effect. The proceeding is a suit against the party to obtain, by decree of court, the benefit of the mortgage right. But where the mortgagor in possession is a sovereign State, no such proceeding can be maintained. The mortgagee's right against the State may be just as good and valid, in a moral point of view, as if it were against an individual. But the State cannot be brought into court or sued by a private party without its consent. It was at first held by this court that, under the Constitution of the United States, a State might be sued in it by a citizen of another State, or of a foreign State; but it was declared by the 11th Amendment that the judicial power of the United States shall not be construed to extend to such suits. *New Hampshire* v. *Louisiana,* 108 U. S. 76; *Louisiana* v. *Jumel,* 107 U. S. 711; *Parsons* v. *Marye,* 114 U. S. 325; *Hagood* v. *Southern,* 117 U. S. 52; *In re Ayers,* 123 U. S. 443."

Applying the ruling made in the case just cited to the case in hand, it to me clearly results that as possession of the alleged pledged or mortgaged stock was never parted with by the State of North Carolina, the right asserted by the State of South Dakota to enforce the alleged pledge comes directly within the prohibition of the Eleventh Amendment, since in its essence it depends upon the existence in this court of the power to enforce against the State of North Carolina in favor of the State of South Dakota, a mere promise made by North Carolina to a private individual, as to which the State of South Dakota acquired no greater right than was possessed by the individual who made the transfer to it of the bonds in question.

*Third.* Finally, putting out of view the various considerations which I have previously stated, in my opinion this record discloses a condition of things which ought to prevent a court of equity from exerting its powers to enforce for the benefit of the State of South Dakota the claim which it asserts against the State of North Carolina. From the facts which I have at the outset recited it is undeniable that at the time the gift was made to the State of South Dakota of the bonds in question

they were past due and payment thereof had been more than twenty years prior to the gift refused by the State of North Carolina. The letter evidencing the gift demonstrates that the purpose of the gift to the State of South Dakota, was to enable that State to assert a cause of action against the State of North Carolina which did not exist in favor of the transferrer. It also appears by the act of the legislature of South Dakota, under which this suit was brought, that the State of South Dakota deemed that it might acquire a mere right to litigate, since the act itself in advance provided that the attorney general of the State should prosecute actions in the name of the State to recover on bonds or choses in action which might be transferred to the State, and that it contemplated litigation without cost to itself, since the act empowered the attorney general to employ counsel to prosecute suits, the compensation to be paid *out of the proceeds which might be realized.* This condition of things, in my opinion, although it may not be champertous in the strict sense of that word is in its nature equivalent to a champertous engagement, whose enforcement is contrary to public policy, and one which a court therefore ought not to lend its aid to carry into effect. It has been sometimes said that the doctrine of maintenance and champerty has no application to the sovereign. But this can alone be justified by taking into view the high attributes which pertain to sovereignty. Now if the State of South Dakota may avail of the delegation of judicial power over controversies between States—a power conferred in view of the sovereign dignity of all the States—for the purpose of destroying the sovereignty of another State by subjecting such State to judicial coercion concerning a claim of a private individual, then it seems to me the State of South Dakota should be treated as any other private individual seeking to enforce a private claim, and should have applied to it by a court of equity the principles of morality and justice which control such courts in refusing aid to persons who acquire merely litigious and speculative claims. As said by this court, in the course of its opinion in *Randolph* vs. *Quidnick Co.*, (1890) 135 U. S. 457: "It is a case where equity, true to its ideas of sub-

stantial justice, refuses to be bound by the letter of legal procedure, or to lend its aid to a mere speculative purchase which threatens injury and ruin to a large body of honest creditors, who have trusted for the payment of their debts to the legal validity of proceedings theretofore taken." How aptly these observations apply to the case in hand is shown when it is considered that the holders of more than two million dollars of bonds of the same class as that held by the State of South Dakota, more than twenty years before the transfer to that State, accepted, on the faith of the operation of the Eleventh Amendment, and the circumstances surrounding the State of North Carolina at the time, the adjustment proposed by the act of 1879; and therefore that the claim of South Dakota now urged, in effect, as I have previously stated, seeks to avail of the result brought about by the operation of the Eleventh Amendment, and yet at the same time to deny its efficacy as regards the rights which it claims. It is additionally shown by the inference arising from the record that the whole fiscal system of the State of North Carolina in existence since the adjustment of 1879 has rested upon the action taken by the creditors of the State consequent upon their reliance upon the possession by the State of the attributes of sovereignty which it was the purpose of the Eleventh Amendment to consecrate.

But eliminating all the previous reasoning and considering the case upon the hypothesis that the controversy is one between States, nevertheless I am of opinion that the court is without jurisdiction. And the statement of the reasons which impel me to this conclusion involves an examination of the second proposition which was by me at the outset stated, that is—

### (B.)

*The want of power to render the decree which is now directed to be entered, because of the absence of essential parties whose presence would oust jurisdiction and the impotency to grant any relief whatever in the absence of such parties.*

Even under the view that the general conclusions of the

court as to its authority over the controversy as one between States is well founded, I cannot agree that the holders of the bonds issued in aid of the North Carolina Railroad are not essential parties to this controversy, since the nature of the relief specifically prayed necessitates their presence, and since, without such presence, in my opinion, no decree giving substantial relief to the complainant or doing justice to the principal defendant, can be rendered. If they are such essential parties, it is not questioned that the court is without jurisdiction. *California* v. *Southern Pacific Company*, 157 U. S. 229.

Under the assumption that there was a valid mortgage in favor of the complainant and other holders of the same class of bonds, the bill proceeds upon the theory that it is essential that it be determined what claim or right the holders of the bonds issued in aid of the North Carolina Railroad have upon or in the stock in question. To that end the bill challenged the existence of any right of pledge in favor of such bondholders, upon the theory that, as against the holders of bonds issued in aid of the Western North Carolina Railroad, they had lost their right by accepting the compromise of 1879. It is, however, further asserted in the bill that even if the holders of the bonds issued in aid of the North Carolina Railroad had not, by accepting the compromise of 1879, lost their rights as to the complainant and those similarly situated, yet as the pledge was past due when the adjustment of 1879 was entered into, it was essential, to afford the complainant relief as a junior secured creditor on the stock, that the entire stock be sold free from all encumbrances. And this was also the position taken by the answer filed on behalf of the representative of the outstanding bonds issued in aid of the Western North Carolina Railroad. The bill, then, having been framed upon the theory of the necessity of the specific relief referred to, which could not be afforded without the presence of the other lienholders, the cause, it seems to me, ought not now to be decided upon a wholly different theory, and relief, inconsistent with that specifically prayed for, be awarded to the complainant upon that changed basis.

SOUTH DAKOTA *v.* NORTH CAROLINA.    353

192 U. S.   WHITE, J., The CHIEF JUSTICE, MCKENNA, DAY, JJ., dissenting.

But, leaving out of view the considerations just stated, it seems, to me the decree which it is proposed to enter cannot afford any specific relief to the complainant, without destroying or materially impairing the rights of the prior lienholders, although they are now held not to be essential parties to the controversy. The pledge in favor of the holders of the bonds issued in aid of the North Carolina Railroad was of all the stock and for the benefit of all the bonds. It was therefore indivisible. It cannot be divided without impairing the obligations of the contract in favor of those creditors. Now, whilst each of the ten mortgages which it is in effect held the complainant possesses purported to be of ten shares of stock securing each bond, no particular ten shares were delivered, segregated or identified. As a result no division of the stock held by the State had in fact ever been made, and, therefore, each and every one of the ten shares assumed to be mortgaged to secure each of the bonds were subject to the prior lien on all the stock in favor of all the holders of bonds issued in aid of the North Carolina Railroad. When the attempt is made to enforce the decree in this case what shares will be sold? If any particular shares, then, unless the rights of the prior lienholders are to be rendered divisible, although they are indivisible, the shares sold must continue to be subject to the entire pledge in favor of all the bonds issued in aid of the North Carolina Railroad. To state this situation, it seems to me, is to demonstrate that the decree will afford no substantial relief whatever. The best that can be said, under such circumstances, is that the effect of a sale so made will be merely to foment a law suit. A court of equity, when its aid is invoked to give particular relief, if it finds that it is unable to do it, ought not, whilst denying such relief, to enter a decree which confers no substantial relief, but, on the contrary, can only serve as a fruitful source of future litigation, injurious to the rights of the very party or class of persons in whose favor the decree is rendered. But this is not all, for whilst the decree will, in substance, deprive the complainant of any real benefit from his assumed security, a sale under the decree must also result injuriously to the State

of North Carolina. Its rights, as well as those of the complainant, are entitled to consideration. The possibility of a deficiency decree is now taken into account in the opinion and rights on that subject are reserved. But if the sale which is to be ordered is one which must lead to a prejudicial result, then the effect of the decree is simply to order a sale which can produce at best no more than a nominal sum, and will lay a foundation for a deficiency decree for an amount wholly out of proportion to the actual value of the mortgaged property. It is to my mind no answer to point out that whilst there was no segregation and delivery of the ten shares of stock mortgaged to secure each bond, as such division was provided for, a court of equity will treat that as being done which should have been done. The fallacy of this lies in failing to consider the rights of the prior lienholders and overlooking the fact that their lien was indivisible, and that the segregation provided for in the act of 1866 could not be made without being subordinate to the entire sum of the prior and indivisible right of pledge. When this is borne in mind it results that the rights of those prior lienholders are necessarily clouded or impaired by decreeing that a court of equity will treat that as having been done which ought to have been done; when the very question is, could it have been done efficaciously, consistently with the rights of the prior lienholders? They are, therefore, I submit, essential parties, if it is proposed to give any real relief by the decree of sale which is ordered. If it is not proposed to give that character of relief, then such a decree ought not to be entered, especially when it does not accord with and in reality is inconsistent with the specific relief asked for.

I am authorized to say that the CHIEF JUSTICE, MR. JUSTICE McKENNA and MR. JUSTICE DAY concur in this dissent.