In re SKYLINE
CONDOMINIUMS, Debtor.

W. Steve SMITH, Trustee, Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE,
CORPORATION, et al.,
Defendants.

FEDERAL DEPOSIT INSURANCE
CORPORATION, Plaintiff,

Don R. Mullins, Capital Bank, N.A.
Intervening Plaintiffs,

v.

W. Steve SMITH, Trustee, E. Mitchell
Smith, Jr., and Skyline
Condominiums, Defendants.

Bankruptcy No. 79–00813–HS.
Adv. Nos. 86–0325, 81–0213.

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Sept. 10, 1986.

Blanco & Telge, Celso B. Suarez, Jr., Houston, Tex., for Fragumar Corp., N.V. and Francisco Gutierrez M.

Axelrad, Callison & Schimmel, Vilhelm Hesness, Houston, Tex., for Daniel E. O'Connell, Trustee.

Meredith, Donnell & Abernethy, W. Bradford Hill, Jr., Corpus Christi, Tex., for Federal Deposit Ins. Corp.

Sewell & Riggs, David S. Elder, Houston, Tex., for MBank Houston Nat. Ass'n.

Sheinfeld, Maley & Kay, Thomas A. Collins, Houston, Tex., for Don R. Mullins.

## MEMORANDUM DECISION AND ORDER

EDWARD J. RYAN, Bankruptcy Judge.

The case sub judice is rara avis. There remain surplus funds after liquidation of the debtor's assets and after all creditors of the debtor, a joint venture, were paid in full. After distribution, there remain the sum of $314,863.56. Pending are two adversary proceedings involving those entities asserting an interest in the surplus funds.

The debtor, Skyline Condominiums, ("Skyline Condominiums"), was a joint venture formed by and between Fragumar Corporation, N.V. ("Fragumar"), E. Mitchell Smith, Jr. ("Smith"), and Graydon Dunlap ("Dunlap"), pursuant to a written Joint Venture Agreement ("Joint Venture Agreement") executed on February 1, 1978.

According to the Joint Venture Agreement, Skyline Condominiums' purpose was to acquire, own, hold, manage, improve, operate, maintain, sell or lease as an investment for the production of income, a tract of the land. One hundred thirty-eight condominium units were to be constructed on the property and sold to the public no later

than 18 months after the date of the agreement.

Smith's capital contribution to the joint venture was the conveyance to the venture of the property upon which the improvements were to be made. As an additional contribution, Smith was to donate to the joint venture all plans, specifications, studies, engineering data, loan commitments and contracts made in connection with the development of the property and construction of the improvements thereon.

Fragumar's contribution was $225,000 in cash. Whatever Dunlap's contribution was, is not set forth in the Joint Venture Agreement.

The construction of the 138 condominium units did not commence because of adverse market conditions.

On November 6, 1979, an involuntary Chapter 11 petition was filed by Smith and Dunlap against Skyline Condominiums. An order for relief was entered against Skyline Condominiums on February 21, 1980. An order converting the Skyline Condominiums case from a Chapter 11 case to a Chapter 7 case was signed on December 15, 1981.

In 1981 Federal Deposit Insurance Corporation ("FDIC"), a judgment creditor of Smith, initiated adversary proceeding no. 81–0213 seeking a charging order against Smith's partnership interest in Skyline Condominiums. Soon thereafter, complaints in intervention were filed in the adversary by two other judgment creditors of Smith, Don R. Mullins ("Mullins") and MBank, N.A., the successor in interest to Capital Bank, also seeking charging orders against Smith's partnership interest.[1]

On April 6, 1984, E. Mitchell Smith personally filed for relief under Chapter 7 of the Code. Daniel E. O'Connell was appointed the Chapter 7 trustee ("Trustee") for Smith's estate.

On April 9, 1986, the Skyline Condominiums trustee filed a complaint in interpleader initiating adversary proceeding no. 86–0325, naming as defendants all interested parties in the surplus funds of the Skyline Condominiums proceedings. These funds were deposited into the registry of the Court. An order discharging the trustee from all further liability in the adversary proceeding was signed on May 28, 1986.

FDIC, Mullins, and MBank, N.A.'s application to consolidate the interpleader action filed by the trustee of Skyline Condominiums in adversary proceeding no. 86–0325, with the charging claimants adversary proceeding no. 81–0213, was granted on June 26, 1986. Trial of the two adversary proceedings was commenced that same day.

The initial issue is: "Who is entitled to the surplus monies from the Skyline Condominiums proceedings?"

FDIC, Mullins, and MBank, N.A., and the Trustee, assert that paragraph 3 of the Joint Venture Agreement sets forth the respective percentages in the overage that each of the joint venturers is entitled to.

Fragumar, one of the partners in Skyline Condominiums, on the other hand, claims a superior right to the remaining Skyline Condominiums funds pursuant to paragraph VIII of the Joint Venture Agreement. Fragumar argues it is entitled to its initial capital contribution of $225,000.00 pursuant to Section 40 of the Texas Uniform Partnership Act as well as paragraph VIII of the Joint Venture Agreement, before any profits are distributed.

■ Fragumar argues that Section 40 of the Texas Uniform Partnership Act governs this case. Section 40 mandates that upon dissolution of a partnership, those partners who made capital contributions are to be paid their contribution before the partners can share in profits. Fragumar's reliance upon Section 40 of the Texas Uniform Partnership Act is misplaced. That section applies only if there is no written agreement between the parties by which a distribution can be made. The parties here

---

1. FDIC obtained a judgment against Smith in the principal amount of $163,558.63; Mullins obtained three judgments in the aggregate principal amount of $331,551.52; and MBank, N.A. obtained a judgment in the principal amount of $42,992.62.

entered into the Joint Venture Agreement, which contains its own distribution provisions.

Paragraph III of the Joint Venture Agreement follows:

## III.

### Interest of Venturers

The assets, liabilities, profits and losses, and expenses of the venture shall be shared by the venturers in accordance with the following percentages (referred to herein as the distributive shares):

| Venturer | Distributive Shares |
|---|---|
| Fragumar | 7.5% |
| Smith | 70.0% |
| Graydon Dunlap | 22.5% |

In paragraph VIII the joint venturers agreed:

### Distributions, Allocations, Profit, and Losses

"8.1 The term "Available cash" shall mean the amount by which the Venture's cash on hand and in banks is in excess of the reasonable working capital requirements of the Venture (as determined by the Managing Venturer) to discharge the then current obligations of the Venture. 8.2 Available cash, if any, shall be distributed in the following order:

(a) First, on each of ... there shall be paid, in cash to Fragumar, Five Thousand Six Hundred Twenty Five Dollars ($5,625.00).

(b) Second, on ... there shall also be paid, in cash to Fragumar, One Hundred Fifty Thousand Dollars ($150,000.00).

(c) Third, on ... until all of the Property has been sold or until the total capital contribution of Fragumar has been returned to it was hereafter provided, whichever is the first to occur, there shall be paid, in cash to Fragumar, One Thousand Eight Hundred Seventy Five Dollars ($1,875.00).

(d) Fourth, on ... there shall be paid, in cash to Fragumar, Seventy Five Thousand Dollars ($75,000.00).

(e) After paying the foregoing amounts in full, all remaining Available Cash shall be paid to the Venturers on ... in proportion to their respective Distributive Shares as of the date of distribution until the total amount of net profits derived by the Venture have been distributed; provided, that in addition to Fragumar's Distributive Share as set out in Section 3, above, Fragumar shall be entitled to receive a further amount of the net profits of the Venture equal to the same proportion of two and one-half percent (2 ½%) as the number of calendar months, rounded to the nearest monthly, after January 31, 1979, that elapse before the payment to Fragumar called for in Section 8.2(d) is made, bears to twelve (12) calendar months, payment of such additional amount to be made proportionately with the other payments called for in this Section 8.2(e); and further provided that Fragumar shall receive not less than Fifty Thousand Dollars ($50,000.00) from the distribution provided for in this Section 8.2(e). The distribution contemplated by this Section 8.2(e) shall be completed by no later than January 31, 1980.

8.3 In the event the Venture has insufficient Available Cash to make the quarterly distributions required under Section 8.2(a) and 8.2(c) when due, or if the Venture has insufficient Available Cash to make the payments provided for in Sections 8.2(b) and 8.2(d) when due, or if the Venture has insufficient Available Cash to make the minimum distribution provided for in Section 8.2(e), then Smith shall make such payments to Fragumar. The obligations of Smith under this Section 8.3 shall constitute a personal liability obligation and shall not be charged to the Venture, directly or indirectly. Such payments shall constitute guaranteed payments under the provisions of Section 707(c) of the Internal Revenue Code and any tax deductions available to the Venture by reason of such payments by Smith shall be allocated exclusively to Smith.

\*      \*      \*      \*      \*      \*

8.5 Except as provided in Section 8.2, all profits and losses of the Venture (including all items of income, gain, expense, loss and deduction), as well as all investment credits for tax purposes, shall be shared by and allocated, credited and charged for all purposes to each Venturer in proportion to such Venturer's Distributive Share as of the date of such allocation.

8.6 All Available Cash shall be deposited as it becomes available in a separate bank account and shall be used solely for the purpose of making the distributions contemplated in Section 8.2, above."

As mentioned above, the construction of the 138 condominiums never occurred. Thus the joint venture did not generate any "Available Cash," as defined in paragraph 8.1 of the Joint Venture Agreement. Due to the lack of "Available Cash," Skyline Condominiums never made any of the quarterly payments to Fragumar as would have been required by paragraph 8 of the Joint Venture Agreement if "Available Cash" had been generated.

Smith testified at the trial that the intent of the Joint Venture Agreement was to make the quarterly payments a personal obligation of Smith if Skyline Condominiums could not make them. Because Skyline Condominiums was unable to make any payments pursuant to paragraph 8.2, he personally paid any amounts required to be paid pursuant to 8.3. Both Fragumar and Smith intended to and did give effect to the language of paragraph 8.3, which limits Fragumar's recourse against the joint venture to Smith.

Smith's personal payment of quarterly distributions to Fragumar was entirely consistent with paragraph 8.3. Since Skyline Condominiums did not generate any "Available Cash" with which to pay Fragumar,

the payments, according to paragraph 8.3 of the Joint Venture Agreement, were no longer chargeable to the joint venture, either "directly or indirectly," but instead were solely the personal responsibility of Smith.

Fragumar's argument that the language in paragraph 8.3 was intended to make Smith a supplemental guarantor, and not to replace the obligation of the Joint Venture directly with Smith, is without merit. Furthermore, Fragumar's contention that Skyline Condominiums should also be required to pay Fragumar "off the top" the quarterly distributions called for in paragraph 8.2, would render the provisions of paragraph 8.3 meaningless as paragraph 8.3 clearly limits the liability of Skyline Condominiums to the "Available Cash" generated by the joint venture.

■ There is no conflict between paragraphs III and VIII in the document at hand. Paragraph III controls. However, even if there were a conflict between the provisions, i.e., if the contract were ambiguous, the contract even then would have to be construed against Fragumar.

■ Smith testified that the Joint Venture Agreement was drafted by the attorney representing Fragumar and its principal officer, Mr. Gutierrez, at Fragumar's request.[2]

Because Skyline Condominiums failed to generate "Available Cash" as defined under paragraph 8.1 rendering paragraph 8.2 meaningless, the funds in dispute are to be distributed to each of the joint venturers in accordance with paragraph 3 of the Joint Venture Agreement.

Fragumar is entitled to receive a 7.5% interest in the funds; Smith, a 70.0% interest in the funds; and Graydon Dunlap, a 22.5% interest in the funds.[3]

**2.** It is only when an ambiguity exists or there is conflict between two or more provisions of a contract, that the rule of *contra proferentem* may be made so that the contract must be construed most strictly against the party who drafted the agreement and thus was responsible for the language used. *Republic National Bank*

*v. Northwest National Bank,* 578 S.W.2d 109 (Tex.1978); 14 Tex.Jur.3d *Contracts* (1983).

**3.** While the charging claimants, FDIC, Mullins, and MBank, agree that Dunlap is legally entitled to 22.5% of the proceeds of Skyline Condominiums, they urge that since he filed no answer in these proceedings, and has made no claim to the

Now we address the issue: Who is entitled to Smith's 70% interest in the surplus monies?

The Trustee contends that Smith's 70% interest in the surplus monies of the joint venture is property of Smith's personal bankruptcy estate pursuant to 11 U.S.C. § 541. He argues that an order signed by Judge John R. Blinn on September 30, 1981, in adversary no. 80–0192 [4] invalidates all claims of FDIC, Mullins, and MBank, N.A., against the estate of Skyline Condominiums or the proceeds of the sale of Skyline Condominiums. He invokes res judicata.

We disagree with the Trustee's interpretation of that order of Judge Blinn's.

Judge Blinn stated, in pertinent part, at page 3:

"ORDERED, ADJUDGED AND DECREED that, *without prejudice* to any claims against E. Mitchell Smith, Jr., the claims of ... Capital National Bank, Federal Deposit Insurance Corporation, ... Don R. Mullins ... be, and the same are hereby, disallowed as against this estate or the aforesaid proceeds of sale and the purported liens, claims or encumbrances asserted by such claimants against such proceeds *only* be, and the same are hereby, invalidated." (emphasis added)

FDIC, Mullins and MBank, N.A., have since 1981 sought the imposition of charging orders pursuant to Article 6132b, Section 28 of the Texas Partnership Act.[5] Claiming they are entitled to the surplus monies, the judgment creditors, FDIC, Mullins, and MBank, N.A., continue to seek charging orders pursuant to Article 6132b, Section 28 of the Texas Partnership Act against Smith's interest in the proceeds from the Skyline Condominiums bankruptcy.[6]

FDIC, Mullins, and MBank contend that their request for a charging order in adversary proceeding No. 81–0213 constitutes compliance with the statute prescribing the method for perfecting imposition of a charging order.

They contend that by filing the adversary proceeding in 1981, Smith's partnership interest in the Skyline Condominiums Joint Venture was, in effect, attached in accordance with Texas partnership law.

All interested parties had actual notice of that fact. Such attachment, they argue, took place over three years prior to the filing of Smith's personal bankruptcy, and constitutes not only a lien against, but an actual ownership interest in Smith's partnership interest in this joint venture. As a

---

funds, his 22.5% interest should be distributed among the other parties to these proceedings. It is irrelevant that Dunlap failed to assert an interest in the funds. He is entitled to 22.5% of those funds under the provisions of the Joint Venture Agreement.

4. That proceeding was commenced in June, 1980, when the trustee of Skyline Condominiums filed a complaint against various defendants seeking to sell certain real property free and clear of all liens, claims, and encumbrances. The judgment creditors in the case at bar objected to such sale free of all claims.

5. This Article prescribes the procedure for levy and attachment by a judgment creditor against the partnership interest of a partner against whom the judgment has been obtained. This remedy is very similar to a garnishment. Unlike attachments of tangible personal property or real property, judgment creditors seeking a charging order cannot take physical possession of, or record a lien against, a partnership interest.

6. § 28. Interest in Partnership Subject to Charging Order.

Sec. 28. (1) On due application to a competent court by any judgment creditor of a partner (or of any other owner of an interest in the partnership), the court which entered the judgment, order, or decree, or any other court, may charge the interest of the debtor partner (or such other owner) with payment of the unsatisfied amount of such judgment debt with interest thereon; and may then or later appoint a receiver of his share of the profits, and of any other money due or to fall due to him in respect of the partnership, and make all other orders, directions, accounts and inquiries which the debtor partner (or such other owner) might have made, or which the circumstances of the case may require.

\*    \*    \*    \*    \*    \*

(3) Nothing in this Act shall be held to deprive a partner (or other owner) of his right, if any, under the exemption laws, as regards his interest in the partnership.

result, the 70% interest owned by Smith in Skyline Condominiums should be distributed pro rata to FDIC, Mullins, and MBank, based on their prior judgments against Smith. The charging claimants request that the charging orders, predicated upon valid abstracted judgments obtained in the state courts, be granted.

The Trustee's position, to the contrary, is that the "charging order" claimants failed to perfect the lien afforded by Tex.Rev.Civ. Stat.Ann.Art. 6132b Section 28, prior to the filing of Smith's personal bankruptcy.

The Trustee appointed in Smith's personal bankruptcy, claims the funds attributable to Smith's interest in the joint venture belong solely to Smith's bankruptcy estate as no "charging order" was entered by a court of competent jurisdiction. The Trustee maintains that a bankruptcy court is not a court of competent jurisdiction to enter such a charging order since this proceeding involves a "non-core matter" under 28 U.S.C. Section 157. Thus, before the charging order claimants, FDIC, Mullins, and MBank, N.A., may assert any claim to the Skyline Condominiums monies, they must first prove that a charging order was issued by a "court of competent jurisdiction."

The Trustee avers that no such order was entered, hence, he argues, these judgment creditors are unsecured creditors of Smith, entitled only to a *pro rata* share of any distribution from Smith's estate.

FDIC, Mullins, and MBank, N.A., did seek to obtain a charging order against Smith's interest in the partnership. The claimants did their best to obtain a trial date and ruling on their request for a charging order. Due to the vast flow of judicial business, the parties seeking the charging order were unable to obtain a trial date until June 26, 1986, some five years after the adversary was filed.

These claimants shall not be penalized because of the heavy docket of this court.

 Smith did not file his personal bankruptcy petition until April, 1984, some three years after the adversary proceeding against him was initiated. The bankruptcy court as a court of equity will treat as done that which ought to be done. *South Dakota v. North Carolina,* 192 U.S. 286, 354, 24 S.Ct. 269, 291, 48 L.Ed. 448 (1904).

Accordingly, the charging claimants' application for a charging order is granted nunc pro tunc as of the date of the commencement of the adversary proceeding seeking that relief. Smith's 70% interest in the $314,863.56 is hereby jointly awarded to FDIC, Mullins, and MBank to be divided among them pro rata, based on the amounts of their respective state court judgments.

Let judgment enter accordingly.